Gary WILLIAMS, et al.

v.

Martin WASSERMAN, et al.

No. CIV. CCB–94–880.

United States District Court,
D. Maryland.

Sept. 27, 2001.

*MEMORANDUM*

BLAKE, District Judge.

This case raises complex medical, social and fiscal issues not easily addressed by litigation.[1] The twelve representative plaintiffs are described either as "traumatically brain injured" ("TBI") or "nonretarded developmentally disabled" ("NRDD"). Each is or has been a patient in a Maryland state institution. They have brought claims under the Due Process Clause of the United States Constitution, pursuant to 42 U.S.C. § 1983, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* seeking relief for the State's failure to provide them community treatment rather than institutional care.

In 1996, the court issued an opinion denying the parties' cross-motions for summary judgment. *Williams v. Wasserman,* 937 F.Supp. 524 (D.Md.1996). Thereafter, a 32–day bench trial was held. After hearing the evidence and considering the post-trial briefs, the court concludes that the plaintiffs have failed to prove their ADA and due process claims. Pursuant to Federal Rule of Civil Procedure 52(a), the following memorandum constitutes the court's findings of fact and conclusions of law.

*BACKGROUND*

*General Background*

In April 1994, plaintiff Gary Williams filed suit on behalf of himself and a putative class of similarly situated individuals seeking to have the State develop and implement a community-based treatment plan for each class member.[2] In that suit,

---

1. It is unfortunate that decision makers on both sides were not able to reach a mutually acceptable resolution of this case years ago.

2. The case initially was assigned to Judge Peter J. Mesitte, and later was transferred to the undersigned judge.

Mr. Williams named as defendants several officials from the Maryland Department of Health and Mental Hygiene ("MDHMH"): Nelson Sabatini, the Secretary, Mary Mussman, the Deputy Secretary for Public Health, Jack Buffington, the Chief Executive Officer of the Developmental Disabilities Administration ("DDA"), and Stuart Silver, the Director of the Mental Hygiene Administration ("MHA"). Since that time, Martin Wasserman has replaced Mr. Sabatini, Georges Benjamin has replaced Ms. Mussman, and Diane Ebberts has replaced Mr. Buffington as defendants in this suit.

In February 1995, the plaintiffs agreed to withdraw their Motion for Class Certification in light of the defendants' assurance that the "State would apply the individual relief granted to all other persons similarly situated and in light of the fact that non-party beneficiaries can enforce the Court's Order pursuant to F.R.C.P. 71." (PJM–94–880, PJM–91–2564, letter submitted on February 6, 1995.)[3] On June 13, 1995, Charles Biggs and Bobbie Kemble moved to intervene as plaintiffs. The court granted their motions on September 5, 1995 and granted a similar motion filed by plaintiff Ronald Cullen on February 29, 1996. (CCB–94–880, Orders issued September 5, 1995 and February 29, 1996.)[4]

Pursuant to an agreement among the parties, discovery was conducted on a group of 12 representative plaintiffs chosen by plaintiffs' counsel.[5] (Pls.' Mot. for Partial Summ. J. at 1–2; Defs.' Mot. for Summ. J. at 7–8.) That group includes nine TBI patients and three NRDD patients. All twelve of the representative plaintiffs are appropriately described as developmentally disabled. (Pls.' Opp. to Defs.' Mot. for Summ. J. at 2 n. 1.) The Maryland Code defines "developmental disability" as

> a severe chronic disability of an individual that:
>
> (1) Is attributable to a physical or mental impairment, other than the sole diagnosis of mental illness, or to a combination of mental and physical impairments;
>
> (2) Is manifested before the individual attains the age of 22;
>
> (3) Is likely to continue indefinitely;
>
> (4) Results in an inability to live independently without external support or continuing and regular assistance; and
>
> (5) Reflects the need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services that are individually planned and coordinated for the individual.

MD. CODE ANN., Health–General § 7–101(e) (2000). The two groups of plaintiffs are distinguished by the cause of their developmental disabilities. The TBI patients

---

**3.** The plaintiffs renewed their motion for class certification in January 1996; it was denied without prejudice on August 19, 1996. (CCB–94–880, Order issued August 19, 1996.)

**4.** For purposes of discovery and pretrial motions, this case was consolidated with three others, *Hunt v. Meszaros* (PJM–91–2564), *Steven J. v. Sabatini* (K–93–3679), and *Hattie J. v. Sabatini* (K–94–1107). (PJM–91–2564, Memorandum and Order issued February 10, 1995.) *Hunt* was the first of those cases filed. In that case, the residents of the Great Oaks Center, a residential institution for developmentally disabled patients, sought relief based on inadequate treatment and facilities provided to them at the institution. Like *Williams,* that case proceeded through discovery using 16 representative plaintiffs, rather than the entire class of residents. Great Oaks closed in early 1996 and the parties stipulated to a dismissal of the case on September 8, 1998. Accordingly, that case and the other two with which *Williams* was consolidated have been resolved and do not bear directly on the merits of this suit.

**5.** This discovery mechanism followed the plan used in *Hunt.* (PJM–91–2564, Order issued April 21, 1995.)

have suffered brain damage as the result of an accident or assault; the NRDD patients either have had developmental disabilities since birth or early childhood, or have suffered brain damage as the result of an illness. Mentally retarded patients were excluded explicitly from the suit. (Defs.' Mot. for Summ. J. at 7 n. 6, *citing* Pls.' Renewed Mot. for Class Cert.) [6]

The brain injuries incurred by the representative plaintiffs have rendered them very difficult to care for. They exhibit a set of characteristic symptoms which include "disorders of self-regulation such as low frustration tolerance, proneness to irritability, difficulty planning and directing behavior, ... and confusion, disorientation [and] memory loss as well." (Culotta Tr. 10/21/96 at 21.) [7] In addition, they can become aggressive or prone to uncontrollable impulsive behavior. (Cassidy Tr. 12/11/96 at 30.) As described at trial, "the majority of these individuals are actually handicapped by destructive behavior." (*Id.*)

Each of the representative plaintiffs has been a patient in a state residential institution and some remain residents. Those hospitals are administered by MHA which is a unit of the MDHMH. MD. CODE ANN., Health–General §§ 2–101, 2–107(a), 10–406 (2000). DDA, another unit within MDHMH, also manages residential facilities, but they are for mentally retarded patients and are not at issue in this case. *Id* § 7–501. Both MHA and DDA also administer community treatment facilities and day programs for which the representative plaintiffs may qualify; they also may provide funding for patients to attend community and day placements that they do not administer. *Id.* at §§ 7–601–714, 10–514–524, 10–903.

In this case, the plaintiffs argue that they have been kept in state institutions despite acknowledgments that the residential hospitals are not appropriate for them and recommendations that they be placed in the community. They contend that this institutionalization violates the ADA and their due process rights. The plaintiffs have characterized the relief they seek as follows:

1. Declare that the defendants do not have the right to confine the plaintiffs in state psychiatric hospitals indefinitely when the treating professionals have recommended that plaintiffs are ready for discharge to the community;

2. Enjoin the defendants to place the plaintiffs into the more integrated, appropriate community based settings recommended by their treating professionals;

3. Enjoin the defendants to provide plaintiffs with an evaluation and placement process similar to that afforded to persons in the *Knott* program.[8]

(Pls.' Post–Trial Reply at 5–6.)

In July 1996, the court denied the parties' cross-motions for summary judgment on the grounds that the court's jurisdiction did not end when the representative plaintiffs were released from state institutions, that the opinions expressed by the defendants' litigation experts were not conclusive of the due process claim, and that issues of material fact existed regard-

---

6. The statute defines mental retardation as "a developmental disability that is evidenced by significantly subaverage intellectual functioning and impairment in the adaptive behavior of an individual." MD. CODE ANN., Health–General § 7–101(*l*) (2000).

7. These descriptions were given in the context of the TBI patients, but the NRDD plaintiffs in this case exhibited similar behaviors.

8. See *infra* section entitled "ADA Claim" for a description of the "*Knott* class" and its relevance to the plaintiffs' claims.

ing the ADA claim. *Williams,* 937 F.Supp. at 524. Beginning in September 1996, the court held a 32–day bench trial which concluded on September 15, 1997.[9] The parties then submitted post-trial briefs summarizing the evidence and arguments presented at trial.[10] In addition, both sides submitted post-trial memoranda regarding the impact of the Supreme Court's decision in *Olmstead v. L.C.,* 527 U.S. 581, 607, 119 S.Ct. 2176, 2190, 144 L.Ed.2d 540 (1999). This briefing concluded in September 1999. No further factual evidence regarding the representative plaintiffs has been submitted since the close of the trial. Accordingly, this opinion employs the current state of the law, but reflects the facts as they were presented to the court between September 9, 1996 and September 15, 1997.

*The Representative Plaintiffs*

To more effectively manage discovery, the parties agreed to limit the evidence in this case to a set of twelve representative plaintiffs. Each of those plaintiffs claims to have been kept unnecessarily in a state institution rather than being provided community treatment. Since this suit was filed, several of the plaintiffs have been discharged to the community. Of those

released, however, only Mr. Trail was discharged to an existing community placement; the others had placements developed for them specifically. Mr. Trail's placement was not successful, and two of the representative plaintiffs, Mr. Chance and Mr. Puffinberger, were never discharged to the community. Those three plaintiffs continue to reside in state institutions. Ms. Lentz was discharged to the Deaton Brain Injury Center, a hospital unit that specializes in treating TBI patients. (Litaker Tr. 5/16/97 at 26–28; Beydler Tr. 5/16/97 at 85–86.) In addition, Ms. Kemble and Mr. Pollard, who were discharged to the community, died prior to the close of evidence in September 1997. The following section provides a brief description of each plaintiff's disability and the treatment each received in the state hospitals as well as an account of the efforts made to place each of them in the community.

*Charles Biggs*

On May 11, 1981, Mr. Biggs, then a high school senior, was hit by a drunk driver while riding his motorcycle. He suffered serious injuries and was in a coma for several months. Following the accident,

---

9. Prior to trial, the defendants filed a motion in limine seeking to exclude the testimony of plaintiffs' expert Dr. Nancy Ray. The court did not rule on that motion before trial and allowed Dr. Ray to testify. After hearing her testimony, the opinions of the other designated experts, and the evidence presented at trial, the court has determined that Dr. Ray's testimony is not helpful to its decision. Dr. Ray has no medical degree. Her testimony constituted largely of summarizing aspects of the plaintiffs' medical records and relating conversation she had with staff at the institutions. Accordingly, it will be excluded under Fed. R. Ev. 403 and 702.

10. In their Supplemental Post–Trial Brief, the defendants argued for the first time that the application of the ADA in this case was not a valid exercise of Congress's power under the Commerce Clause or Section 5 of the Fourteenth Amendment. That argument prompted the United States to intervene on behalf of the plaintiffs to defend the constitutionality of the ADA in this context. (*See* U.S. Mem. Supp. Const. ADA; CCB–94–880, Order issued January 13, 1999 granting Motion to Intervene.) On October 13, 1999, however, defendants' counsel submitted a letter in which they withdrew their Supplemental Post–Trial brief and conceded that, because plaintiffs seek only injunctive relief, the suit "falls within the *Ex Parte Young* exception to Eleventh Amendment immunity." *See also Maryland Cmty. Health Sys., LLP v. Glendening,* 115 F.Supp.2d 599 (D.Md.2000). Accordingly, the court is not required to address this issue.

Mr. Biggs was treated at the hospital and in the A.I. Dupont Center program for post-traumatic head injuries before being returned to his parents' care. (Defs.' Trial Ex. CB2 at 2, CB6 at 1.)

Mr. Biggs' parents cared for him until his behavior became unmanageable. He was admitted involuntarily to the Upper Shore Community Mental Health Center in January 1986. (Defs.' Trial Ex. B–1A; *see also* Defs.' Summ. of Evid. at 6.)[11] He remained institutionalized until his release to the Chesapeake Head Injury Center in January 1989. (Pls.' Trial Ex. B–1A.) That placement proved unsuccessful, and he was returned to his parents' care before being placed at the Meridian Point Head Injury Center in Arizona. (Defs.' Trial Ex. CB6 at 1.) He remained at that facility from July 30, 1990 until July 10, 1991 whereupon he was discharged to the Waterview Healthcare Center nursing facility. (*Id.*) Because the nursing home was unable to control his aggressive behavior, and because his condition was deteriorating, Mr. Biggs was admitted involuntarily to the Eastern Shore Hospital Center on June 23, 1993. (*Id.*, Defs.' Trial Ex. CB8 at 1; Pls.' Trial Ex. B–1B at 8.) On December 29, 1995, he was discharged to Crossroads, Inc., a community-based treatment program through which he currently lives alone with a 24–hour attendant. (Defs.' Trial Ex. CB10 at 2; *see also* Defs.' Summ. of Evid. at 6–7.)

As a result of the accident, Mr. Biggs cannot walk unaided, but can manipulate a wheelchair and has used a walker. (Defs.' Trial Ex. CB8 at 1.) He suffers severe cognitive impairment and serious behavioral problems, and can be violent and sexually inappropriate. (*Id.*) While institutionalized, he exhibited verbally and physically

aggressive behavior toward fellow patients and staff, attempted to leave several of the treatment facilities, drove off in unattended cars, and made sexual advances and remarks toward patients and staff. ( Pls.' Trial Ex. B–5; Meade Tr. 4/8/97 at 68; Schretlen Tr. 6/23/97 at 66; *see also* Defs.' Summ. of Evid. at 23–24.)

There has been no showing that Mr. Biggs suffered physical injuries at the hands of other patients or staff while in the treatment facilities. (Eglesder Tr. 4/8/97 at 29.) Nor was he secluded or physically restrained except when placed in a stationary chair as a form of behavior modification. (*Id.* at 33–34; Meade Tr. 4/8/97 at 92–94; Defs.' Trial Ex. CB–15 at 2.) He was given sedative medications, including Ativan, phenobarbital, and Mellaril, periodically to control agitation. (Pls.' Trial Ex. B–1A, B–1B, B–32.)

In 1993, Mr. Biggs was transferred from the Waterview facility to the Eastern Shore Hospital Center at least in part because DDA determined that he would benefit from a community-based program and that he could more easily be placed in one from that facility. (Pls.' Trial Ex. B–13, B–14, B–44.) Indeed, for the duration of Mr. Biggs' placement at the Eastern Shore Hospital Center, the hospital's Utilization Review Committee found him inappropriate for continued hospitalization. (Pls.' Trial Ex. B–62.) Further, the parties agree that the "dispositional goal" or "long-term discharge plan" for Mr. Biggs during his time at that facility was release to a community placement facility and that his treating professionals thought he would benefit from such a placement. (Defs.' Summ. of Evid., App. G–1; Pls.' Trial Ex. B–1B, B–11, B–12, B–16.) Accordingly, efforts to place him at several community

---

**11.** References to various post-trial submissions to the court, including the Defendants' Summation of the Evidence, Plaintiffs' Post– Trial Brief and Plaintiffs' Post–Trial Reply Brief, incorporate the exhibits and testimony referred to therein.

facilities were made in July, September, November, and December 1993. (Defs.' Summ. of Evid., App. H–1.) In February 1994, an application was made to Crossroads, but funding for that placement was unavailable. (Pls.' Trial Ex. B–48.) Mr. Biggs was placed at Crossroads when funding became available in December 1995; he has remained there since that time.

*Edward Chance, Jr.*

Mr. Chance does not have a treatable psychiatric illness and has not suffered a major injury; he is NRDD, not TBI. (Pls.' Trial Ex. EC–1B at 1; *see also* Defs.' Summ. of Evid. at 9.) He suffers from pervasive developmental disorder which has caused the majority of his behavioral difficulties. (Pls.' Trial Ex. EC–18.) He has also been diagnosed as being mildly mentally retarded with borderline intellectual functioning, and suffers from an impulse control disorder. (*Id.*, Ex. EC–23.) [12]

Until he was 15 years old, Mr. Chance attended a series of public school programs for students with special needs. Because those programs were unable to control Mr. Chance's disruptive behavior, his parents admitted him to the Johns Hopkins Hospital in November 1987 for evaluation. (*Id.*, Ex. EC–2 at 32.) Mr. Chance remained at the hospital for eight months whereupon he was discharged to the National Children's Center ("NCC"), a residential program for children with developmental disabilities, in July 1988. (*Id.*, Ex. EC–1B at 2, EC–2.) He remained at NCC for the next six years, until he turned 21.

Upon his discharge from NCC, Mr. Chance was placed with Life, Inc., a community residential service, and attended a day program at which he received one-on-one supervision. (*Id.*, Ex. EC–7, EC–11; *see also* Defs.' Summ. of Evid. at 9.) He remained in the community placement from July through November 1994. (Pls.' Trial Ex. EC–3.) During those five months, Mr. Chance was hospitalized four times for psychiatric emergencies. (*Id.*, EC–1B at 4.) After the fifth such occurrence, the hospital staff contacted the Spring Grove Hospital Center seeking to transfer Mr. Chance to that facility. (*Id.*, Ex. EC–1B at 5.) Mr. Chance was admitted to Spring Grove on November 17, 1994 against the recommendation of that hospital's admissions director. (*Id.*, Ex. EC–15.) Apparently, Mr. Chance was admitted with the understanding that transfer would be sought to the Kennedy Krieger Institute. (*Id.*, Ex. EC–15, EC–1B at 5–6.) Mr. Chance was not accepted at Kennedy Krieger because he did not meet that institution's in-patient criteria. (*Id.*, Ex. EC–37.) Other attempts to transfer Mr. Chance have proven unsuccessful and, as a result, he has remained at Spring Grove since his admission to that facility.

During his residence at Spring Grove, Mr. Chance has exhibited extremely violent and unpredictable behavior. He has assaulted several nurses, patients, and doctors, threatened to kill a nurse and have sex with her dead body, and written threatening notes. (Defs.' Summ. of Evid. at 35.) Moreover, throughout his life, Mr. Chance has shown a fascination with broken glass. (*Id.* at 9.) As a result of his violent behavior, Mr. Chance has been subjected to 2– and 4–point restraints, as well as seclusion, while at Spring Grove. (*Id.* at 35; Pls.' Trial Ex. EC–1B at 14–15.)

---

**12.** The plaintiffs attempted to "withdraw" Mr. Chance as a representative plaintiff. (Tr. 3/3/97 at 3–6.) Because the case had proceeded to trial with Mr. Chance in it, the court refused the request and permitted both sides to present evidence relevant to Mr. Chance. (*Id.*)

He is kept in restraints both as punishment for violent or inappropriate behavior and, for more extended periods of time, to prevent violent outbursts and to keep him controlled. (Pls.' Trial Ex. EC–1B at 14–15; Gray Tr. 4/1/97 at 136–37, 151–52, 161; *see also* Defs.' Summ. of Evid. at 35–36.) With the exception of minor injuries sustained during restraints, there has been no showing that Mr. Chance suffered injuries at the hands of the patients or staff while institutionalized. (*See, e.g.,* Schretlen Tr. 6/23/97 at 58–59; *see also* Defs.' Summ. of Evid. at 24.)

On several occasions during Mr. Chance's residence at Spring Grove, his treating professionals indicated that they were considering community placement for him. (Defs.' Summ. of Evid., App. H–2.) There are not, however, specific recommendations that Mr. Chance be discharged to an existing community placement. (*See, e.g.,* Defs.' Trial Ex. EC–25 at 7.) Rather, there are recommendations for additional programs within Spring Grove to prepare Mr. Chance for an eventual community placement. (Pls.' Trial Ex. EC–1B at 10–11, EC–10.)

*Ronald Cullen*

On April 14, 1972, Mr. Cullen, then 17 years old, was struck by a car and left comatose for several months. When he emerged from the coma, Mr. Cullen was severely brain damaged, physically and intellectually impaired, and suffered post-traumatic seizure disorder. (Pls.' Trial Ex. C–1B at 1.) After being discharged from the hospital, Mr. Cullen received treatment at the Maryland Rehabilitation Center until May 1973. (Pls.' Trial Ex. C–1B.) During that time, his condition improved to the point that he was able to live alternately with his family and girlfriend while working for the United States Government Printing Office. (*Id.,* Ex. C–1A at 1, C–1B at 1.)

In October 1980, Mr. Cullen suffered a second severe head trauma when he was struck on the head with a lead pipe during a mugging. (*Id.*) As a result of the second injury, Mr. Cullen's condition declined, his compliance with the anticonvulsant medication decreased, and he began to suffer uncontrollable seizures; eventually, Mr. Cullen lapsed into a second coma which lasted several weeks. (*Id.,* Ex. C–1A at 1, C–1B at 1, C–3 at 2.) During that coma, Mr. Cullen suffered decreased oxygen to his brain which resulted in further cognitive impairment. (*Id.,* Ex. C–3 at 2.) That impairment prevented him from ·returning to work or living on his own.

From 1980–85, Mr. Cullen lived alternately with his mother and father while attending a day program at the Rock Creek Foundation in Silver Spring, Maryland. (Pls.' Trial Ex. C–1A at 1, C–1B at 2.) From 1985–89, Mr. Cullen lived in a group home in Maryland run by Life, Inc. (*Id.,* Ex. C–1A, C–1B at 2, 210.) Subsequently, Mr. Cullen moved with his mother to Florida where she found supervised housing for him; he spent weekdays in the supervised housing and weekends with his mother. (*Id.*) Mr. Cullen and his mother moved back to Maryland in 1993 to live with Mr. Cullen's brother and his family. Mr. Cullen's brother sought community placement for Mr. Cullen, and DDA recommended him for residential and day services. (*Id.,* Ex. C–44.)

In March 1994, a trial visit was arranged for Mr. Cullen at a community residential program in Hagerstown, Maryland. (*Id.,* C–1B at 3.) The trial was unsuccessful because Mr. Cullen entered a female patient's room during the night and made sexual advances; he also rejected the day program at that facility. (*Id.*) On the way back from that failed trial, Mr. Cullen and his brother got into an altercation, and Mr. Cullen was admitted to the psychiatric

ward at Prince George's County Hospital. (*Id.*) A few weeks later, on April 7, 1994, Mr. Cullen was transferred to the Sheppard and Enoch Pratt Hospital, a private psychiatric hospital. (*Id.*, Ex. C–1B at 3, C–8.) On July 5, 1994, Mr. Cullen was transferred to the Springfield Hospital Center. (*Id.*, Ex. C–9.)

Beginning in March 1995, while in residence at Springfield, Mr. Cullen attended a vocational program run by Athelas for 3½ hours each day. (Pls.' Trial Ex. C–1B at 7.) He remained at the hospital until January 22, 1996 when he began a 28–day trial residence at a community placement facility run by Athelas which eventually led to his discharge from Springfield to that program on February 19. (Pls.' Trial Ex. C–43; Defs.' Trial Ex. G–111B.) He has remained at the Athelas community placement since that time.

As a result of his injuries, Mr. Cullen suffers from ataxia which causes him to lose his balance.[13] (Defs.' Trial Ex. RC–28 at 35–70.) While institutionalized, he exhibited physically aggressive behavior, used inappropriate sexual and racial language, and engaged in frequent physical and verbal altercations. (Pls.' Trial Ex. C–1B; *see also* Defs.' Summ. of Evid. at 25.) To control this behavior, Mr. Cullen was placed in seclusion, but not restrained, on several occasions. (Brandt Tr. 3/6/97 at 610; Pls.' Trial Ex. C–1A, C–1B; *see also* Defs.' Summ. of Evid. at 36–37.) In addition, he was given Ativan to help calm him. (Pls.' Trial Ex. C–1B at 11, C–37; Defs.' Trial Ex. RC–28 at 3.) Further, for much of his time at Springfield, Mr. Cullen was under "1:1" supervision, meaning that he was under the supervision of a staff member whose sole responsibility was to supervise him in order to keep him from harming himself and others. (Reynolds Tr.

10/23/96 at 12–13, 29–30; Defs.' Trial Ex. RC–28 at 19.)

In October 1993, while he was living with his mother and brother in Maryland, DDA found Mr. Cullen eligible for its community residential and day programs and placed him in the "Crisis Resolution" category. (Pls.' Trial Ex. C–44 at 1.) Accordingly, several attempts were made to place Mr. Cullen in a community treatment facility while he resided at the Sheppard and Enoch Pratt Hospital. (Pls.' Post–Trial Reply Brief, App. F–2 at 1–2.) Those attempts proved unsuccessful.

Similarly, from the time he was admitted to Springfield in July 1994, the staff recommended community placement for Mr. Cullen. (Reynolds Tr. 10/23/96 at 8, 40.) Indeed, one month after his admission, $100,000 was requested from DDA to fund a community placement for him. (Pls.' Trial Ex. C–13.) Moreover on September 9, 1994, the Mental Hygiene Administration ("MHA") requested that DDA begin the process to contract community-based services for Mr. Cullen. (*Id.*, Ex. C–14.) In so doing, the Acting Assistant Director of Adult Services for MHA wrote that "[s]ince he has been involved in several incidents, his continued stay at Springfield is precarious. Therefore, it is urgent that this gentleman be placed as quickly as possible." (*Id.*)

Mr. Cullen's records throughout his stay at Springfield refer to the fact that he has met the criteria for community treatment and is awaiting funding or placement. (*Id.*, Ex. C–15, C–16; Defs.' Summ. of Evid., App. G–3; Pls.' Post–Trial Reply at 39 n. 83.) Funding was approved for Mr. Cullen's placement in November 1994. (Defs.' Trial Ex. RC–28 at 33.) Several attempts were made to place Mr. Cullen over the next 14 months. He was accept-

---

**13.** Ataxia "refers to an impairment of skilled movements." (Schretlen Tr. 6/23/97 at 63.)

ed at Absolute Communities in March 1995 but not placed at that facility.[14] (*Id.* at 67.) In June 1995, a second residential program, Other Options, expressed interest in Mr. Cullen, but he was not placed at that facility either. (*Id.* at 85.) Finally, Mr. Cullen was placed at Athelas in January 1996. (Pls.' Trial Ex. C–1A.)

*Connie Jackson*

Ms. Jackson, then 34 years old, was struck by an automobile on May 31, 1987. The driver of the car fled the scene, and Ms. Jackson lay unconscious on the side of the road for some time before being discovered and brought to the hospital. (Pls.' Trial Ex. J–1B at 1, J–3 at 1; *see also* Defs.' Summ. of Evid. at 10.) As a result of the accident, Ms. Jackson suffered brain damage, impaired intellectual ability and speech, severe behavioral problems, and serious physical injuries. (Pls.' Trial Ex. J–1B at 1.)

After several months in a Norfolk, VA hospital, Ms. Jackson was transferred to the National Rehabilitation Center in Washington, DC where she remained until being transferred to St. Elizabeth's Hospital, also in Washington, DC, in February 1988. (Pls.' Trial Ex. J–1A at 1, J–6 at 1, J–7.) On April 21, 1988, Ms. Jackson was transferred to Springfield to be closer to her family. (*Id.*, Ex. J–3; *see also* Defs.' Summ. of Evid. at 10.) In 1989, Ms. Jackson was discharged to a community placement in West Virginia known as "the farm." The placement was unsuccessful due to Ms. Jackson's explosive TBI-induced behavior, and she returned to Springfield after a short stay. (Pls.' Trial Ex. J–1A at 1, J–1B at 2; *see also* Def.'s Summ. of Evid. at 10.) Ms. Jackson was discharged from Springfield for a second time in November 1992. (*Id.*) She spent two nights at a shelter or on the street and then arrived at the Johns Hopkins Hospital emergency room after having her belongings and medication stolen. (*Id.*) She was treated at the psychiatric emergency room and then returned to Springfield where she was admitted for the third time. (Pls.' Trial Ex. J–1A at 2, J–1B 2–3; *see also* Def.'s Summ. of Evid. at 10.) Ms. Jackson remained at Springfield until her discharge to a community residential program run by the Center for Neuro–Rehabilitation ("CNR") in August 1996. (Pls.' Trial Ex. J–48; Defs.' Trial Ex. G–111A at 3.)

While institutionalized, Ms. Jackson was verbally and physically abusive. (Fitzgerald Tr. 3/31/97 at 120–21; Defs.' Trial Ex. CJ–14 at 1.) In addition, she was aggressive and hypersexual and exhibited inappropriate and impulsive sexual behavior. (Zwart Tr. 3/31/97 at 17–18; Defs.' Trial Ex. CJ–40 at 53–54; *see also* Defs.' Summ. of Evid. at 11, 26.) To help control these behaviors, the staff used seclusion, a quiet room, and occasional restraints. (Pls.' Trial Ex. J–1A; *see also* Defs.' Summ. of Evid. at 38.) Ms. Jackson was proscribed Ativan and, eventually, Mellaril to control her aggression. (Fitzgerald Tr. 3/31/97 at 127; Zwart Tr. 3/31/97 at 20; Pls.' Trial Ex. J–1B.) Also, her treating psychologist developed a formal "behavior management plan" for Ms. Jackson which the plaintiffs claim was inadequate. (Cassidy Tr. 12/11/96 at 89; *see also* Defs.' Summ. of Evid. at 52; Pls.' Post–Trial Br. at 64.) While at Springfield, Ms. Jackson also participated in numerous organized activities. (Defs.' Summ. of Evid., App. D.)

Ms. Jackson was not considered appropriate for discharge to a community-based facility until some time after being institutionalized. (Pls.' Post–Trial Reply, App.

---

**14.** The plaintiffs disagree with the defendants' assertion that the reason for the failed placement was the bankruptcy of that program. (Pls.' Post–Trial Reply, App. F–2 at 5.)

F–3.) The first indications that Ms. Jackson was ready for community placement occurred in 1994 when her treatment team indicated that she had been determined clinically appropriate for a less restrictive environment, but that no appropriate placement had been found. (Pls.' Trial Ex. J–61.) Over the next two years, Ms. Jackson was referred to a number of community treatment facilities, but was not accepted by any of them. (Pls.' Post–Trial Reply, App. F–3; Defs.' Summ. of Evid., App. G–4, H–4.) The record indicates that, during this time, her treating doctors found she could benefit from community treatment, but there was no facility available to meet her needs. Indeed, the testimony and medical records contain repeated references to the doctors' opinion that an adequate community placement simply did not exist for a patient with Ms. Jackson's needs. (*See* Defs.' Summ. of Evid., App. G–4; Pls.' Post–Trial Reply, App. F–3.)

Ms. Jackson began to show behavioral improvement after being prescribed Mellaril in late 1995 or early 1996; one of the psychologists who treated Ms. Jackson, Cheryl Zwart, testified that Ms. Jackson was not ready for discharge to community treatment until that time. (Zwart Tr. 3/31/97 at 20; *see also* Pls.' Post–Trial Reply at 42 n. 98.) On January 24, 1996, the state held a "Prebidders Conference" at which agencies were invited to submit treatment and budget proposals for TBI patients, including Ms. Jackson, who were ready for discharge to a community treatment facility. (Pls.' Trial Ex. J–47.) CNR was the successful bidder for Ms. Jackson, and she was discharged to that program in August 1996. There was concern up to the point of her discharge, however, that the facility would not provide adequate supervision regarding the dispensing of medication. (Defs.' Trial Ex. CJ–40 at 196.)

*Felix Karn*

When he was seven and again when he was nine years old, Mr. Karn contracted tubercular meningo-encephalitis. The two episodes of the disease left him with brain damage, impaired intellectual functioning, severe behavioral problems, and partial paralysis of his left side. (Pls.' Trial Ex. FK–1B at 1–2; *see also* Defs.' Summ. of Evid. at 11.) He is NRDD, but not TBI. (*Id.*) Until 1967, Mr. Karn resided, alternatively, with his aunt and uncle, their family, and for some of the time, his mother. (Pls.' Trial Ex. FK–1C, FK–4, FK–5, FK–7.) In 1967, Mr. Karn, then 17 years old, began exhibiting increasingly problematic behavior which eventually led to his placement in a foster home. (*Id.*, Ex. FK–1B at 2.) His behavior deteriorated over the course of a year, and he was admitted to Springfield on June 4, 1968. (*Id.*, Ex. FK–8.)

Mr. Karn remained at Springfield until December 1984, when he was placed in a community program at the Rock Creek Cornerstone Group Home. (*Id.*, Ex. FK–9 at 4.) [15] He was taken from that placement in April 1989 and returned to Springfield after becoming severely distraught upon learning of his uncle's death. (*Id.*, Ex. FK–1B at 2.) Approximately four months later, Mr. Karn was discharged to the residential placement in West Virginia known as "the farm." (*Id.*, Ex. FK–1B at 2, FK–10.) He did not succeed at the farm and was re-admitted to Springfield in April 1990. (*Id.*, Ex. FK–14, FK–31A at 2.) Mr. Karn remained at Springfield until he was discharged to a community treatment facility through the Head Injury Rehabilitation

---

15. Mr. Karn was formally discharged from Springfield on May 2, 1985 after residing at the Rock Creek facility for 5 months. (Pls.' Trial Ex. FK–9 at 5.)

Referral Service ("HIRRS") on March 6, 1997. (Defs.' Summ. Of Evid. At 11.)

As a result of his brain damage, Mr. Karn exhibits poor judgment, loud and aggressive outbursts, and unpredictable behavior, including stealing and attempting to direct traffic. (Pls.' Trial Ex. FK–1B at 3–4, FK–9 at 3.) There was no testimony that Mr. Karn suffered physical injuries while at Springfield. He was, however, occasionally secluded to control his behavior, and he was prescribed Haldol to control his aggression. (Treisman Tr. 3/5/97 at 392; Pls.' Trial Ex. FK–1A.) While at Springfield, Mr. Karn had a written treatment plan that included behavior management. (*Id.* at 366.) He participated in structured occupational and recreational groups and had unstructured time to himself. (Greenwald Tr. 3/4/97 at 226; *see also* Defs.' Summ. of Evid. at 53–54.) He also participated in on-and off-campus vocational day programs. (Greenwald Tr. 3/4/97 at 255–59.)

Beginning in October 1992, and continuing until his discharge, Springfield's Utilization Review Committee "disapproved" Mr. Karn's continued hospitalization. (Pls.' Trial Ex. FK–16.) In December 1992, the hospital applied to DDA on behalf of Mr. Karn seeking day and residential services. (*Id.*, Ex. FK–28; Greenwald Tr. 3/4/97 at 251–52.) Further, in January 1993, in recommending that Mr. Karn be discharged, hospital staff wrote that "[h]e is ready to leave and live in the community if day and residential programs are available. At this time he is in the priority of inappropriately institutionalized." (Pls.' Trial Ex. FK–3 at 2.) Throughout 1993 and 1994, meetings were held by the hospital staff and DDA representatives in an at-tempt to find a community placement for Mr. Karn. (Pls.' Post–Trial Reply, App. F–4.)

In June 1994, Mr. Karn was referred to HIRRS. Apparently, HIRRS submitted a treatment plan to DDA for Mr. Karn in August 1994, and that plan was rejected due to inadequate funding. (*Id.;* Pls.' Trial Ex. FK–24 at 3–4; Greenwald Tr. 3/4/97 at 264–65.) [16] In March 1995, in an effort to locate alternative treatment options, Mr. Karn met with representatives from HIRRS again. (Pls.' Trial Ex. FK–24 at 5.) In May 1995, Mr. Karn was interviewed by representatives from a residential program called Vantage Place but was not accepted. (*Id.*, Ex. FK–25 at 2.) In November 1996, a social worker contacted HIRRS, and a program was established for Mr. Karn which led to his discharge in March 1997. (Pls.' Post–Trial Reply, App. F–4; Defs.' Summ. of Evid., App. H–5.)

*Bobbie Kemble*

On April 2, 1988, Ms. Kemble, then a 16–year–old high school junior, was struck by a motorcycle driven by a friend. (Pls.' Trial Ex. BK–2 at 1.) The next day she lapsed into a coma that lasted several weeks. After receiving acute care at the hospital, she was transferred to the Kennedy Institute in Baltimore for rehabilitation. (*Id.*, Ex. BK–1A at 1, BK–2 at 1.) Four months later she was discharged to her family. (*Id.*, Ex. BK–1A at 1.) Despite suffering brain damage and severe physical injuries and exhibiting impaired intellectual functioning and behavioral problems as a result of the accident, Ms. Kemble completed high school. (*Id.*, Ex. BK–2 at 1.)

**16.** Mr. Karn's medical records actually refer to an organization called the "National Head Injury Foundation." (Pls.' Trial Ex. FK–24.) The plaintiffs equate this organization with HIRRS, and the defendants have not disagreed. (Pls.' Post–Trial Reply, App. F–4; Greenwald Tr. 3/4/97 at 264–65.)

Soon after graduating, Ms. Kemble's behavior became unmanageable, and she was placed in an Easter Seal's Group Home. (*Id.*) Her father removed her from the group home and, in September 1989, Ms. Kemble was admitted to a rehabilitation center in New Hampshire. (*Id.*) While at that facility, Ms. Kemble began to engage in rectal digging, a behavior in which she manually extracts feces by inserting her hand into her rectum. (*Id.; see also* Defs.' Summ. of Evid. at 7.) Because the rehabilitation center could not treat that behavior, Ms. Kemble was transferred in June 1990 to the Cumberland Hospital in New Kent, VA. (Pls.' Trial Ex. BK–2 at 1.) In January 1991, Ms. Kemble's family insurance changed and Cumberland Hospital would no longer accept it. (*Id.*) Accordingly, she was discharged to Westbrook Hospital, a general public hospital in Richmond, and then transferred to Central State Hospital, a Virginia state psychiatric hospital (*Id.*) For the next three years, Ms. Kemble's family sought to have her transferred to a Maryland facility. (*Id.*) They succeeded in July 1994, and Ms. Kemble was transferred to the Thomas B. Finan Center in Cumberland, MD. (*Id.,* Ex. BK–22.) Ms. Kemble remained at that facility until February 23, 1996, when she was discharged to a community facility run by HIRRS. (Defs.' Trial Ex. G–111B.) She died from undetermined causes less than one week later. (Pls.' Trial Ex. BK–1B.)

In addition to engaging in rectal digging, Ms. Kemble was physically and verbally aggressive, stole from other patients, and became frustrated or distracted easily. (Pls.' Trial Ex. BK–5 at 3–4, 6; *see also* Defs.' Summ. of Evid. at 7.) Physically impaired, she walked with an unsteady gait. (Pls.' Trial Ex. BK–5 at 4.) The staff at Finan used a variety of methods to control Ms. Kemble's rectal digging and aggressive behavior. (Lease Tr. 4/2/97 at 8–13.) A behavior management plan was created, but it was inconsistently applied and proved unsuccessful in decreasing those behaviors. (*Id.* at 16–17, 22–25; *see also* Defs.' Summ. of Evid. at 55.) At times, Ms. Kemble was secluded and was placed in 2– or 4–point restraints or a geri-chair and posey vest. (*Id* at 39; Pls.' Trial Ex. BK–1A, BK–1B, BK–54 at 3.)[17] In addition, she was given Haldol and Ativan, sometimes intramuscularly, to control those behaviors. (Pls.' Trial Ex. BK–1B at 13.) Eventually, Ms. Kemble was given several treatment medications and provided "1:1" supervision, which apparently improved her behavior. (Schretlen Tr. 6/23/97 at 81; Defs.' Trial Ex. BK–78 at 2–3; *see also* Defs.' Summ. of Evid. at 55.) In addition, though she was unable to attend many of the meetings, she participated in occupational therapy groups and several other structured activities. (Pls.' Trial Ex. BK–1B at 11; *see also* Defs.' Summ. of Evid. at 56.)

Ms. Kemble's records from the weeks immediately after her admission to Finan indicate that her behavior and rectal digging made her inappropriate for placement in a community facility, but that a residential group home in which she was closely monitored and reintegrated into the community would be ideal. (Pls.' Trial Ex. BK–2; Defs.' Trial Ex. BK–9; Pls.' Post–Trial Reply, App. F–5.) In October 1994, DDA placed Ms. Kemble in the Crisis Resolution category for day and residential services. (Pls.' Trial Ex. BK–65.) In November, HIRRS evaluated Ms. Kemble at DDA's request, and a meeting was held at Finan regarding the attempt to place Ms.

**17.** The geri-chair is a stationary device that cannot be moved without assistance, and the posey vest restrains a patient's movement so that she cannot get out of the chair by herself. (Pls.' Post–Trial Br. at 78; Pls.' Trial Ex. LP–1B at 15.)

Kemble in the community. (*Id.*, Ex. BK–31; Pls.' Post–Trial Reply, App. F–5.) In January and again in March 1995, Ms. Kemble's treatment team certified that "continued hospitalization" was indicated for her. (Defs.' Trial Ex. BK–41 at 1, BK–55 at 1.)

In May 1995, the treatment team indicated that Ms. Kemble was ready to be discharged to the community. (Defs.' Summ. of Evid., App. G–6; Pls.' Post–Trial Reply, App. F–5.) She met with HIRRS representatives again in May 1995, and there was an agreement that Ms. Kemble could be discharged to a residential program. (Pls.' Post–Trial Reply, App. F–5.) Funding was approved for Ms. Kemble's community placement in July 1995 and a discharge plan was developed over the next months. (*Id.;* Pls.' Trial Ex. BK–63.) In February 1996, Ms. Kemble was discharged to the community treatment program organized by HIRRS. (Pls.' Trial Ex. BK–1A.)

*Marie Lentz*

In August 1974, Ms. Lentz, then 25 years old, suffered a severe brain injury as the result of a car accident. After being treated at the hospital, Ms. Lentz returned home to live with her husband. In March 1978, her husband left her, and Ms. Lentz moved into an apartment by herself. (Pls.' Trial Ex. L–1B at 2, L–1C at 1.) Approximately one month later, Ms. Lentz was arrested for shoplifting several cartons of cigarettes. (*Id.*, Ex. L–6.) She was referred to Spring Grove Hospital, and voluntarily admitted on April 7, 1978. (*Id.*, L–1C.) Ms. Lentz remained at Spring Grove until her discharge to the Deaton Brain Injury Center in January 1997. (Defs.' Trial Ex. G–111A at 2.)

As a result of her injury, Ms. Lentz developed a compulsive stealing problem which caused her to take the belongings of fellow patients throughout her tenure at Spring Grove. (Pls.' Trial Ex. L–43 at 1, L–63 at 1.) She also displayed verbally and physically aggressive behavior and could be combative. (Litaker Tr. 5/16/97 at 42–44; *see also* Defs.' Summ. of Evid. at 28.) She exhibited poor hygiene and was overweight, which led her to develop insulin-dependent diabetes. (Pls.' Trial Ex. L–2 at 3, Ex. L–76 at 2.) In addition, Ms. Lentz suffered physical injuries in the accident and now walks with a limping gait and has a deformed right arm and speech impediment. (Pls.' Trial Ex. L–1C at 1; *see also* Defs.' Summ of Evid. at 12.)

Ms. Lentz often was involved in altercations in the hospital. As a result, she received injuries ranging from bruises to contusions to sprains and a hip fracture. (Pls.' Trial Ex. L–1B; *see also* Defs.' Summ. of Evid. at 28; Pls.' Post–Trial Br. at 71.) To control her aggressive behavior and prevent her from harming herself and others, Ms. Lentz was placed in restraints and seclusion. (Litaker Tr. 5/16/97 at 22–23.) In addition, prior to 1988, her hands sometimes were placed in mitten restraints to control her stealing. (Taylor Tr. 9/9/96 at 53; Pls.' Trial Ex. L–1B at 4–9, 210.) A behavior management plan was developed for Ms. Lentz in an attempt to modify these behaviors. (Culotta Tr. 10/21/96 at 63.) In addition, Ms. Lentz participated in a number of activities at the hospital. (Litaker Tr. 5/16/97 at 26.) Further, after recovering from a broken hip, Ms. Lentz was kept on the Smith East ward, which generally housed only recuperating patients, for more than one year, ostensibly because that ward offered her greater supervision and stability. (Beydler Tr. 5/16/97 at 92–93; *see also* Defs.' Summ. of Evid. at 57.)

For several years, Ms. Lentz was prescribed Thorazine, an anti-psychotic medication. As a result of that medication, Ms. Lentz developed tardive dyskinesia, which

causes her involuntarily to move her lips and tongue repetitively. (Pls.' Trial Ex. L–62 at 2; see also Defs.' Summ. of Evid. at 67–68.) The Thorazine treatment was discontinued in June 1995. (Pls.' Trial Ex. L–62 at 1.)

When she was first admitted to Spring Grove, Ms. Lentz was referred to foster care, and the hospital planned to look for outside placement. (Pls.' Post–Trial Reply, App. F–6; Pls.' Trial Ex. L–26, L–27, L–30.) She was not accepted for placement at that time and, at least until 1993, all recommendations in her record indicate that continued hospitalization was appropriate. (Pls.' Post–Trial Reply, App. F–6; Defs.' Summ. of Evid., App. G–7.) In 1993, Ms. Lentz was referred to the Deer's Head Injury Unit, but that referral was discontinued "due to an administrative decision." (Pls.' Post–Trial Reply, App. F–6; Pls.' Trial Ex. L–76; Defs.' Trial Ex. ML–23.)

In November 1994, Ms. Lentz's treatment team determined that she could be placed in a less restrictive environment. (Pls.' Trial Ex. L–90; Meszaros Tr. 6/10/97 at 59–60.) From April to June 1995, Ms. Lentz was interviewed by four community treatment facilities. (Defs.' Summ. of Evid., App. H–7.) She was not placed at these facilities and, over the next two years, Ms. Lentz's records reflect that her treatment team thought she could be discharged to a group home if one were available and could be funded. (Pls.' Post–Trial Reply, App. F–6; Defs.' Summ. of Evid., App. G–7.) She was interviewed and screened again in April 1996 by representatives of a program selected by the Baltimore Mental Health Systems who had agreed to place her. (Id.) Ms. Lentz was not placed at that time. She was discharged from Spring Grove in January 1997 to the Deaton Brain Injury Center.

*Alphonso Pollard*

In February 1993, Mr. Pollard was found unconscious in a stairwell. He was taken to Suburban Hospital in Bethesda, MD, where doctors performed a craniotomy to remove a subdural hematoma. (Pls.' Trial Ex. AP–1C at 1.) Apparently, Mr. Pollard had previously suffered a serious head trauma in October 1992. (Id.) He remained at Suburban for four weeks before being admitted to Springfield on March 30, 1993 due to behavior problems. (Id.) Mr. Pollard was discharged to the community in September 1996 and died in April 1997. (Defs.' Summ. of Evid. at 12.)

After his injury, Mr. Pollard demonstrated impaired memory, became easily confused and disoriented, could be combative, and exhibited a tendency to wander off the hospital grounds. (Id. at 29; Pls.' Trial Ex. AP–1B at 1, AP–1C at 1.) When admitted to Springfield, Mr. Pollard also suffered from several physical ailments, including a kidney disorder and active tuberculosis, which likely were due to years living on the streets and drinking heavily prior to his hospitalization. (Pls.' Trial Ex. AP–1C.) Those ailments were treated upon his admission to Springfield and he was given neuroleptic medications; he did not, however, undergo neuropsychological testing. (Treisman Tr. 3/5/97 at 386–90; see also Defs.' Summ. of Evid. at 68–69.) Although he was considered to have TBI, it is also possible that he suffered from Wernicke–Korsakoff syndrome, which is associated with excessive alcohol consumption and poor nutrition. (Pls.' Trial Ex. AP–2; see also Defs.' Summ. of Evid. at 12.)

To control his outbursts, Mr. Pollard was secluded frequently, and was restrained on a few occasions early in his hospitalization. (Pls.' Trial Ex. AP–1A.) The frequency with which Mr. Pollard was secluded decreased over the time he was at Springfield. (Pls.' Trial Ex. AP–1A;

Choma Tr. 3/3/97 at 104–08; *see also* Defs.' Summ. of Evid. at 41.) Mr. Pollard was given Ativan, Hydroxine, and Mellaril to control his agitation. (Pls.' Trial Ex. AP–1A; Treisman Tr. 3/5/97 at 387–88.) A master treatment plan was developed for Mr. Pollard in which methods to control his aggressive behavior were outlined. (Ziesat Tr. 3/4/97 at 161–62.) He participated in several groups at the hospital including an off-campus day program, and particularly enjoyed gardening. (Pls.' Trial Ex. AP–18, AP–19, AP–20; *see also* Defs.' Summ. of Evid at 58–59.) Despite those efforts, Mr. Pollard was involved in several altercations, but was not seriously injured. (Defs.' Summ. of Evid. at 29.)

The first indication Mr. Pollard was ready for community treatment occurred in January 1995 when his treatment team indicated that it would begin pursuing a placement for him. (Pls.' Post–Trial Reply, App. F–7; Hyman Tr. 3/4/97 at 209–10.) Mr. Pollard's records covering the next 18 months are contradictory. On the one hand, in February and March 1995, Mr. Pollard was referred to DDA, and a placement with the Deaton Brain Injury Center was explored. (Pls.' Post–Trial Reply, App. F–7; Pls.' Trial Ex. AP–26.) In April and May of that same year, Mr. Pollard was evaluated by several community treatment facilities, DDA worked to find him a placement, and his records contain notations that he was ready for discharge. (Pls.' Post–Trial Reply, App. F–7; Pls.' Trial Ex. G–298.) On the other hand, one of Mr. Pollard's treating psychologists, Dr. Zeisat, noted throughout this time that Mr. Pollard was not yet ready for community treatment and that continued hospitalization was required. (Pls.' Post–Trial Reply, App. F–7; *see also id.* at n. 2.)

The efforts to discharge Mr. Pollard continued through 1995 and into the summer of 1996. (*Id.*) He was interviewed by a large number of community providers, and eventually placed with CNR. (Pls.' Trial Ex. AP–1A.) Dr. Zeisat apparently did not agree that Mr. Pollard was ready for community treatment until late summer 1996, when he was provided information about the CNR placement. (Def.'s Summ. of Evid., App. G–8.) Mr. Pollard was discharged in September 1996. (*Id.,* App. H–8.)

*Lester Puffinberger*

When he was seven years old, Mr. Puffinberger fell out of a moving car and suffered a brain injury that left him slightly uncoordinated and "not quite the same." (Pls.' Trial Ex. LP–1A at 1, LP–22 at 1; *see also* Defs.' Summ. of Evid. at 13.) He recovered sufficiently to complete school through the ninth grade and hold part-time jobs thereafter. (Pls.' Trial Ex. LP–1C.) On September 1, 1983, Mr. Puffinberger, then 29 years old, was struck by a car while riding a bicycle. (Pls.' Trial Ex. LP–1A at 1.)

After receiving acute care in the hospital for nearly two months, Mr. Puffinberger was transferred to the Bryn Mawr Rehabilitation Hospital in Pennsylvania where he remained until March 5, 1984. (*Id.,* Ex. LP–1A at 1.) At that time, he was transferred to the John L. Deaton Medical Center, a private hospital in Baltimore, where he remained for three years. (*Id.*) In June 1987, Mr. Puffinberger was transferred to the Arundel Geriatric Center where he remained for less than two weeks before being involuntarily committed to the psychiatric ward of North Charles Hospital. (*Id.*) On July 12, 1988, Mr. Puffinberger was discharged to the Inns at Evergreen, a second nursing home. (*Id.* at 2.) He remained there for two weeks before being readmitted to the North Charles Hospital for emergency psychiatric care. On August 8, 1998, Mr. Puffinberger was released back to the Inns at Evergreen

where he remained for approximately one week before being admitted to the emergency room at the University of Maryland Hospital for striking out at others at the nursing home. (*Id.*) When the Inns at Evergreen refused to accept him back, he was transferred to Springfield, where he still remains.

After the second accident, Mr. Puffinberger suffered post-traumatic seizures and was diagnosed as globally aphasic. (Culotta Tr. 10/22/96 at 235.) He has a severe cognitive impairment and, since the accident, has exhibited a limited ability to communicate, becomes easily frustrated and disoriented, and has been verbally and physically aggressive. (Pls.' Trial Ex. LP–2, LP–6.) He is very unsteady on his feet, cannot walk without assistance, falls frequently, is blind in his left eye, and has poor vision in his right eye. (*Id.*)

Mr. Puffinberger's falls have resulted in several broken bones, lacerations, and other injuries. (Culotta Tr. 10/22/96 at 232; Pls.' Trial Ex. LP–1B at 13–14; *see also* Defs.' Summ. of Evid. at 29–30.) To control his agitation and, thereby, prevent him from falling, Mr. Puffinberger has been placed in seclusion and given several medications. (Pls.' Trial Ex. LP–1B at 13, Ex. LP–30, LP–35; *see also* Defs.' Summ. of Evid. at 41.) In addition, a master treatment plan was developed for Mr. Puffinberger to encourage good behavior. (Treisman Tr. 3/5/97 at 411; *see also* Defs.' Summ. of Evid. at 59–60.) He has attended physical and communication therapy as well as day and evening group activities. (Defs.' Summ. of Evid. at 60–61.) He has also been under "1:1" supervision for significant periods of his time at Springfield. (Defs.' Trial Ex. LP–29.)

In 1993, after his second ankle fracture, the hospital placed Mr. Puffinberger in a geri-chair and posey vest to prevent him from injuring himself. (Pls.' Trial Ex. LP–57.) Apparently, Mr. Puffinberger has spent most of his waking hours, when not participating in therapy sessions, in the geri-chair, or a wheelchair, and the vest. (Pls.' Trial Ex. LP–1B at 14–15; *see also* Defs.' Summ. of Evid. at 41–42; Pls.' Post–Trial Br. at 78.) The devices have not been entirely successful in preventing injury, however, as Mr. Puffinberger has fallen from bed and while being transferred from his wheelchair. (Pls.' Trial Ex. LP–1B at 14.)

When first admitted to Springfield, Mr. Puffinberger was not an appropriate candidate for community treatment. (Defs.' Trial Ex. LP–26.) In March 1990, Mr. Puffinberger's treatment team referred him to DDA seeking community day and residential services. (Pls.' Trial Ex. LP–7; Goldman Tr. 3/4/97 at 281.) In January 1991, DDA approved Mr. Puffinberger for the "priority category of inappropriate institutionalization" and stated that he would be considered for community services when funding was available. (*Id.*, Ex. LP–8.) Over the next five years, Mr. Puffinberger's records reflect that he was considered to be a poor candidate for community treatment or placement in a nursing home. (Pls.' Post–Trial Reply, App. F–8; Defs.' Summ. of Evid., App H–9, G–9.)

Beginning in January 1995, renewed efforts were made to place Mr. Puffinberger. A second application was made to DDA, and in March, he was placed in the "crisis resolution" category for day and residential services. (Pls.' Trial Ex. LP–65 at 1.) Over the next two years, Mr. Puffinberger's medical records reflect that he was ready for discharge from Springfield, and he was referred to a significant number of treatment facilities. (*Id.*, Pls.' Post–Trial Reply, App. F–8; Defs.' Summ. of Evid., App. H–9.) Thus far, none of the placement efforts have been successful, and Mr. Puffinberger remains at Springfield.

*John Trail*

Shortly after birth, Mr. Trail was placed at an orphanage and then with foster parents. At age two, he suffered a severe convulsion. In the years that followed, he suffered several more convulsions and was diagnosed with epilepsy at age four. (Pls.' Trial Ex. T–1B, T–1C.) As a result of the seizures, Mr. Trail suffered brain damage that caused him to exhibit behavioral problems, including tantrums and aggression. (*Id.*, Ex. T–1B at 1, T–2.) Until 1957, Mr. Trail lived alternately in an orphanage and nine foster placements. (*Id.*, Ex. T–1B at 1, T–1C.) He completed the sixth grade and, in 1957, at age 12, Mr. Trail was admitted to Springfield. (*Id.*)

Mr. Trail remained at Springfield until 1968 when he was transferred to the Clifton T. Perkins Hospital, Maryland's maximum security psychiatric institution. (*Id.*, Ex. T–1A, T–6.) He was transferred back and forth between Perkins and Springfield three times over the next four years because he could not be managed at Springfield. (*Id.*, Ex. T–1A, T–6, T–7.) He remained at Springfield from 1973 until 1982 when he was transferred back to Perkins. (*Id.*, Ex. T–1A, T–3.) From Perkins he was discharged to a community placement organized by People Encouraging People ("PEP") in December 1996. (Pls.' Post–Trial Reply, App. F–9.) While at the community facility, Mr. Trail assaulted a staff member with a space heater which resulted in his re-admission to Perkins in February 1997. (Defs.' Trial Ex. JT–61.) He has remained at Perkins since that time.

Mr. Trail demonstrates difficulties with agitation, low impulse control and self-destructive behavior. (Pls.' Trial Ex. T–3 at 1.) He is also verbally and physically aggressive and has assaulted fellow patients and hospital staff. (*Id.*) There is no indication, however, that Mr. Trail suffered any serious injury himself as a result of this behavior. (Defs.' Summ. of Evid. at 30–31.) To control his aggressive behavior, Mr. Trail has been frequently secluded and restrained. (*Id.* at 42–43; Pls.' Trial Ex. T–1A, T–1B at 9–10.) He has also been given Ativan and other PRN medications to calm him. (Defs.' Trial Ex. JT–12; Pls.' Trial Ex. T–1B at 10, T–20; *see also* Defs.' Summ. of Evid. at 42–43.) Eventually, seclusion and restraint were used less frequently in favor of quiet time and calming medication. (Defs.' Trial Ex. JT–15, JT–19; *see also* Defs.' Summ. of Evid. at 43.)

A comprehensive behavior modification plan was implemented for Mr. Trail which was designed to reward positive behaviors. (Defs.' Trial Ex. JT–13, JT–21 at 3; Kuhns Tr. 4/8/97 at 134, 143–44; *see also* Defs.' Summ. of Evid. at 61.) He participated in "1:1" occupational therapy sessions while at Perkins and, beginning in March 1991, he attended an off-ward day program funded by DDA for several hours three days each week. (Pls.' Trial Ex. T–1A; *see also* Defs.' Summ. of Evid. at 62.) Mr. Trail succeeded quite well at the day program. (Pls.' Post–Trial Br. at 66–67.)

There is no indication that Mr. Trail was ready for community placement prior to 1992. At that time, his treatment team recommended that he be transitioned to a supervised community facility which could provide a more consistent environment and more individualized attention. (Pls.' Trial Ex. T–12, T–37; Pls.' Post–Trial Reply, App. F–9.) In November 1993, the team applied to DDA for community services; it noted Mr. Trail's need as "very urgent, in crisis." (Pls.' Trial Ex. T–9 at 7.) Over the course of the next year, Mr. Trail's treatment team worked to prepare him for a less restrictive environment. (Defs.' Summ. of Evid., App. G–10; Pls.' Post–Trial Reply at 55–56, App. F–9.) During that time, the team applied to DDA to

fund Mr. Trail's placement, but DDA refused, apparently because he scored too highly on an IQ test and did not have an acute psychiatric illness; he, therefore, did not fit a category of patients for whom funding was available. (Pls.' Post–Trial Reply, App. F–9.)

In late 1994 and early 1995, the treatment team began to explore placement through the Baltimore Mental Health Systems. (Id.) Mr. Trail was determined to be an inappropriate candidate for placement at the Hamilton House, a "halfway house," because the facility provided insufficient structure. (Id.) His behaviors began to improve in June 1995 and, in September, the treatment team recommended that he be transitioned to community placement at PEP. (Id.) Beginning in January 1996, Mr. Trail was slowly transitioned to an existing community placement at PEP's residential facility, known as the Winston House. (Id.) Over the course of that year, there were difficulties with Mr. Trail's behavior and the funding necessary to effect the transition, but he was formally discharged from Perkins in January 1997. (Id.) In February 1997, he attacked a staff member at that facility and was returned to Perkins where he has remained. (Id.)

### Gary Williams

On July 27, 1980, Mr. Williams, then 19, was the victim of a hit-and-run car accident. He suffered severe physical injuries and remained in a coma for several months. (Pls.' Trial Ex. W–1B at 1; see also Defs.' Summ. of Evid. at 5.) After receiving acute care, Mr. Williams was transferred to the Montebello Hospital for rehabilitation. (Pls.' Trial Ex. W–1A; see also Defs.' Summ. of Evid. at 5.) In March 1981, he was transferred to the Crownsville Hospital Center, a state psychiatric institution, because his behavior was unmanageable. (Id.) Mr. Williams was released to his parents' care in January 1982. (Id.)

From 1982–1988, Mr. Williams lived either with his parents or in a community residential program. (Id.) Periodically during that time, he was placed in psychiatric hospitals when his behavior became unmanageable. (Id.) In August 1988, Mr. Williams was admitted to Springfield. (Defs.' Trial Ex. GW–2.) One year later, he was transferred to Perkins because his erratic behavior could not be controlled at Springfield. (Id., Ex. GW–4.) Mr. Williams remained at Perkins until being discharged to a community placement operated by the Community Based Alternative and Initiatives residential program in June 1996. (Pls.' Trial Ex. W–1A.)

As a result of the accident, Mr. Williams has exhibited impaired intellectual functioning, seizures, hearing loss, cognitive deficits, an unsteady gait, and emotional instability. (Pls.' Trial Ex. W–2.) He can be aggressive and self-injurious and exhibits inappropriate sexual behavior, including public masturbation, exposing himself, and kissing and grabbing female staff. (Joseph Tr. 4/9/97 at 25; Pls.' Trial Ex. W–5; see also Defs.' Summ. of Evid. at 5.)

There was no testimony that Mr. Williams suffered physical injuries other than minor wounds inflicted in altercations, many of which he instigated. (Pls.' Trial Ex. W–35, W–46; see also Defs.' Summ. of Evid. at 31.) To control his aggressive behavior, Mr. Williams was placed in restraints while at Perkins. (Pls.' Trial Ex. W–30, W–35.) Apparently, Mr. Williams was not secluded because he became self-injurious during seclusion. (Def.'s Trial Ex. G–21 at 5.) Mr. Williams was given several different medications to treat his physical ailments, control his psychosis, and calm him. (Pls.' Trial Ex. W–30; Defs.' Trial Ex. GW–3, GW–5, GW–6, GW–10; see also Defs.' Summ. of Evid. at

43.) In addition, the staff developed a behavior management plan for him which involved redirecting Mr. Williams to a low-stimulus environment on occasions when he became agitated. (Briskin Tr. 4/3/97 at 132–33.) Mr. Williams also attended an off-campus day program run by Developmental Services Group, Inc. beginning in June 1990. (Pls.' Trial Ex. W–31; Defs.' Trial Ex. GW–7 at 2.)

In September 1989, a few months after his admission to Perkins, a staff member filed a grievance with DHMH on behalf of Mr. Williams stating that Mr. Williams should not have been admitted to Perkins because he is "DDA–NR and not mentally ill." (Pls.' Trial Ex. W–49.) In response to the grievance, the Unit Director wrote that Mr. Williams, "while assaultive at times, requires intensive behavior modification [and] attention ... This patient does not require max[imum] security hospitalization." (Id., Ex. W–19.) The resident Grievance System Central Review Committee issued a final ruling on the grievance on October 30, 1989. The committee did "not totally agree that the transfer to [Perkins] was inappropriate." (Id., Ex. W–20.) It stated that Mr. Williams's behavior could be more effectively managed at Perkins, but acknowledged that "Mr. Williams could benefit from a transfer to a highly structured, staff intensive, behavior modification program." (Id.) It went on to state that none of the MHA facilities were capable of providing that service, but that a plan of care had been constructed for Mr. Williams. That plan included evaluating Mr. Williams for a day program and "provid[ing] an individually tailored community residential program." (Id.) If he could not be placed in the particular residential program specified, other placements would be explored. (Id.)

A planning session with DDA was held in January 1990 to discuss the services to be provided to Mr. Williams. In the months that followed, Mr. Williams was evaluated by DDA, and a search was begun for a residential program for him. (Id., Ex. W–56.) Though specifics are not provided, Mr. Williams's records indicate both that continued hospitalization was inappropriate for Mr. Williams and that placement in a community facility was being sought actively beginning at that time. (Pls.' Post–Trial Reply, App. F–10; Defs.' Summ. of Evid., App. G–11, App. H–11.) In July 1993, DDA confirmed its intention to fund a placement for Mr. Williams. (Pls.' Trial Ex. W–9A.) In March 1994, a bid was made to provide residential services for Mr. Williams at a two-year cost of $250,773. (Id., Ex W–12.) That proposal was rejected as overly expensive and potentially unsafe. (Id.)

In July 1994, two providers submitted proposals to place Mr. Williams. (Id., Ex. W–47, W–48.) The proposal submitted by the Developmental Services Groups was presented to the Maryland Board of Public Works ("BPW") for approval, as required by state law, because it would cost more than $100,000. (Id., Ex. W–28.) The BPW voted unanimously not to award the contract. (Id.; see also id., Ex. W–42; Defs.' Trial Ex. GW–34.) A second BPW hearing was held in November 1994 at which the Board again refused to award the contract, found Mr. Williams too dangerous for community placement, and stated that there were patients in more dire need of community placement. (Pls.' Post–Trial Reply, App. F–10; Def.'s Summ. of Evid., App. G–11.)

Beginning in the summer of 1995, new medications lessened Mr. Williams's symptoms. (Briskin Tr. 4/3/97 at 122–135.) In January 1996, Mr. Williams was presented to the Forensic Review Board for input on placing him in the community. (Id. at 135–36.) The Board recommended com-

munity placement. (Pls.' Trial Ex. W–35.) Several providers were considering Mr. Williams at this time. (Defs.' Trial Ex. GW–33 at 1.) Mr. Williams was discharged in June 1996 to a community placement operated by the Community Based Alternative and Initiatives residential program. (Pls.' Post–Trial Reply, App. F–10.)

## ANALYSIS

### I. Due Process

The standards applicable to the plaintiffs' substantive due process claims have not changed significantly since the court's earlier opinion in this case. Indeed, the Supreme Court did not reach the due process claim in *Olmstead* because neither lower court had done so. *See Olmstead,* 527 U.S. at 588, 119 S.Ct. at 2181. Thus, the touchstone for the court's analysis remains *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

■ In *Youngberg,* the Court addressed the substantive rights of a mentally retarded individual who was confined involuntarily to a state mental institution. As this court stated in its earlier opinion, "[u]nder *Youngberg,* the plaintiffs in this case possess substantive liberty interests that require the State to provide adequately safe conditions, reasonable freedom from bodily restraint, and 'minimally ade-

quate or reasonable training to ensure safety and freedom from undue restraint.'" *Williams,* 937 F.Supp. at 526 (quoting *Youngberg,* 457 U.S. at 319, 102 S.Ct. at 2460).[18] To determine whether those rights have been violated, the court must balance the plaintiffs' "liberty interests against the relevant state interests." *Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461. In so doing, the court must ensure only "that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (Seitz, C.J., concurring)). Long-term treatment decisions "normally should be made by persons with degrees in medicine or nursing" or other appropriate training, and are "entitled to a presumption of correctness." *Id.* at 323–24 n. 30, 102 S.Ct. at 2462 n. 30.[19]

■ As the Fourth Circuit noted, however, "[t]he decisions of the treating professionals are not conclusive," and the opinions of experts at trial may be "relevant to whether the treating professionals' decisions substantially departed from accepted standards." *Thomas S. v. Flaherty,* 902 F.2d 250, 252 (4th Cir.1990) (citation omitted).[20] In *Thomas S. IV,* the court affirmed the district court's conclu-

---

**18.** In *Youngberg,* the State conceded a duty to provide "adequate food, shelter, clothing, and medical care" to patients in a mental institution. 457 U.S. at 324, 102 S.Ct. at 2462.

**19.** In the context of the training required, the Court stated that

the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. *See also Thomas S. v. Flaherty,* 902 F.2d 250, 252 (4th Cir.1990) (applying this quotation to the determination generally); *Thomas S. v. Morrow,* 781 F.2d 367, 375 (4th Cir.1986) (same).

**20.** This case is the fourth in the *"Thomas S."* line of cases: *Thomas S. v. Morrow,* 601 F.Supp. 1055 (W.D.N.C.1984)(*Thomas S. I* ); *Thomas S. v. Morrow,* 781 F.2d 367 (4th Cir.1986)(*Thomas S. II* ); *Thomas S. v. Flaherty,* 699 F.Supp. 1178 (W.D.N.C.1988)(*Thomas S. III* ); and *Thomas S. v. Flaherty,* 902 F.2d 250 (4th Cir.1990)(*Thomas S. IV* ).

sion that class members were entitled to "*minimally adequate* habilitation in a setting *minimally adequate* to reduce self-abuse and aggression" and determined that the lower court had set up an appropriate process through which the class members' needs would be evaluated by medical professionals. *Id.* at 253–54 (emphasis in original). Thus, to establish a constitutional violation, the plaintiffs must demonstrate that the State failed to provide conditions of "reasonable safety and freedom from physical restraint," and "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg*, 457 U.S. at 319, 102 S.Ct. at 2459–60.[21]

The plaintiffs have argued that a set of standards exists for the treatment of patients with TBI or NRDD. (Pls.' Post–Trial Br. at 55–58; Pls.' Post–Trial Reply at 64–67.) Their experts, Dr. Taylor and Dr. Culotta, spent a significant amount of time at trial explaining those standards and their origins. (Taylor Tr. 9/9/96 at 41–45; Taylor Tr. 9/10/96 at 231–43; Culotta Tr. 10/21/96 at 25–33, 41–46, 73–74.) The plaintiffs' experts opined that these standards include "a highly structured, low stimulus environment, along with consistently implemented behavioral treatment services and structured activities" as well as "modification of and activities within the environment to facilitate skill development ..., individualized behavior programming, and trained and experienced individuals to interact with the patient ...." (Pls.' Post–Trial Br. at 56, 57–58; *see also* Pls.' Post–Trial Reply at 64–67; Taylor Tr. 9/9/96 at 41–45; Taylor Tr. 9/10/96 at 231–43; Culotta Tr. 10/21/96 at 25–33, 41–46, 73–74.)

In response, the defendants' experts criticized the scientific articles cited by Dr. Taylor and Dr. Culotta (Treisman Tr. 3/5/97 at 337–41; Brandt Tr. 3/6/96 at 615–17; Janofsky Tr. 6/12/97 at 20–21; Schretlen Tr. 6/23/97 at 31–33), and opined that standards of care had not been established in the published literature. (Cassidy Tr. 12/11/96 at 39–41; Treisman Tr. 3/5/97 at 335; Brandt Tr. 3/6/97 at 598; Lyketsos Tr. 4/1/97 at 16; Janofsky Tr. 6/12/97 at 20–21; Schretlen Tr. 6/23/97 at 31.) Each judged the sufficiency of care administered by the hospitals in accordance with his own clinical experience, familiarity with treatment facilities, and the standards published for "other psychiatric patient[s] who may have these kinds of problems." (Lyketsos Tr. 4/1/97 at 16; Schretlen Tr. 6/23/97 at 33; Janofsky Tr. 6/12/97 at 20–21.)

From the testimony received at trial, it is clear that credible experts disagree about the sufficiency of the treatment methods used in the state institutions. On one side, the plaintiffs' experts would require more intensive environmental management, functional analyses, and behavior management plans. In contrast, the defendants' experts have advised that the state institutions provided considered and

---

**21.** In their reply to the plaintiffs' post-trial brief, the defendants rely on *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) for the proposition that a constitutional violation occurred only if they acted in an arbitrary manner or in a way that shocks the conscience. (Defs.' Reply to Pls.' Post–Trial Br. at 10–11.) In that case, however, the Court analyzed the actions of a police officer during a high-speed chase. It did mention *Youngberg*, but did so in order to explain the countervailing interests at work in that case which required the State to "take thought and make reasonable provision for the patients' welfare." *County of Sacramento*, 523 U.S. at 852 n. 12, 118 S.Ct. at 1719 n. 12. Thus, the Court's opinion does not alter the analysis under *Youngberg*. It does make clear, however, that the focus of the court's inquiry should be on whether the plaintiffs have proven that the defendants' conduct was sufficiently arbitrary or egregious to deprive them of due process. *Id.* at 846–47, 118 S.Ct. at 1716–17.

flexible treatment for a group of very difficult patients. The court is persuaded that the defendants' experts have presented the more reasonable approach. While many aspects of the plaintiffs' experts' recommendations are appropriate to varying degrees in individual cases, the flexibility supported by defendants' experts has more credibility as a basis for evaluating the care provided to the representative plaintiffs. Accordingly, rather than describing a set of uniform treatment standards and then determining whether the care administered at the state institutions met those criteria, the court will determine whether the treating professionals employed reasonable judgment in caring for these patients, whether any of the treatment recommendations so deviated from ordinary care as to violate the patients' due process rights, and whether any failure to follow treatment recommendations resulted in a constitutional violation. This analysis is conducted below.

*Adequate Food, Shelter, Clothing, and Medical Care*

■ There is no argument in this case that the food, shelter, or clothing provided by the state hospitals was constitutionally deficient. There was, however, testimony about the medical care received by several of the patients.

■ First, as a result of her treatment with the neuroleptic drug Thorazine, Ms. Lentz developed tardive dyskinesia. (Taylor Tr. 9/9/96 at 54.) Dr. Taylor testified that, although there was a time during which treatment with Thorazine was appropriate because Ms. Lentz exhibited psychosis, the treatment should not have been administered continuously for 17 years. (*Id.* at 54–55.) Although he does not say so explicitly, Dr. Taylor appears to assert that the additional and, in his opinion, unnecessary time during which Ms. Lentz was prescribed Thorazine contribut-

ed to her tardive dyskinesia or to its severity.

The defendants' expert, Dr. Cassidy, testified that the treating doctors were aware of the risk and made a careful decision to prescribe Thorazine. (Cassidy Tr. 12/11/96 at 46–47.) There is no question that Ms. Lentz exhibited symptoms of psychosis at the time the neuroleptic was prescribed initially, and Dr. Cassidy stated that the risk of tardive dyskinesia did not preclude the use of Thorazine. (*Id.* at 47, 127.) Neuroleptic drugs that do not carry the risk of tardive dyskinesia have only been developed relatively recently and, therefore, were unavailable at the time Ms. Lentz was prescribed Thorazine. (*Id.* at 45.) Dr. Cassidy stated further that the appropriateness of the time frame during which Thorazine was used was difficult to evaluate because it was unclear precisely when Ms. Lentz exhibited psychotic symptoms. (*Id.* at 47, 127–28.) He testified, however, that patients can develop tardive dyskinesia after using Thorazine for only a few months. (*Id.* at 128.)

The experts agree that the initial prescription of Thorazine was appropriate, notwithstanding the risk of tardive dyskinesia. Dr. Cassidy's testimony, and the evidence from the record, (Defs.' Trial Ex. G–14, ML–20 at 2, ML–23 at 3, ML–27, ML–51 at 2, 5, 18, 22–23), show that the treating professionals were aware of the risk that Ms. Lentz would develop tardive dyskinesia and exercised their judgment in continuing her treatment with anti-psychotic medications. Accordingly, the court finds no constitutional violation.

■ Second, Dr. Taylor stated that treating Mr. Pollard with neuroleptics and benzodiazepines initially was inappropriate because it may have impaired his recovery by inhibiting production of the neurotransmitter dopamine. (Taylor Tr. 9/9/96 at

79–80.) He based that conclusion, however, on animal studies and admitted that evidence that these drugs inhibit dopamine production "in the human data ... is very tenuous." (*Id.* at 80.) Moreover, the defendants' expert, Dr. Treisman, testified that, although "[y]ou probably wouldn't ideally choose a benzodiazepine," it was used appropriately when other medications did not control Mr. Pollard's seizure disorder, and that Mr. Pollard seemed to have a good response to it. (Treisman Tr. 3/5/97 at 387.) Further, he stated that, although "[p]eople always have great trepidation about using" neuroleptics like Haldol and Mellaril because they inhibit dopamine production, they are the only drugs "that have been proven in studies to have benefit in labile and agitated patients over a chronic period of time." (*Id.* at 388.) Other than the animal studies he referenced, Dr. Taylor provided no evidence that the use of those drugs was unacceptable generally or inappropriate in Mr. Pollard's case specifically. Further, the court agrees with Dr. Treisman's assessment that Mr. Pollard's doctors appropriately had "discussed the risks and issues" of using neuroleptics and prescribed them after careful consideration. (*Id.*)

◼ Similarly, Dr. Culotta stated that to maximize his recovery from the head injury, Mr. Pollard should have been discharged to a rehabilitation center immediately following his admission to Springfield. (Culotta Tr. 10/22/96 at 136–37.) There was a significant question, however, whether Mr. Pollard's symptoms were attributable to his head injury or Wernicke–Karsakoff Syndrome. (Defs.' Trial Ex. G–6 at 30.) Moreover, even if he had exhibited symptoms of TBI, it is not clear that he would have benefitted from rehabilita-

tion or further testing. (Treisman Tr. 3/5/97 at 388–90.) Finally, when he was admitted to Springfield, Mr. Pollard suffered from tuberculosis which required extensive treatment at Springfield. (*Id.* at 386.) Thus, the court finds no constitutional violation in the medical treatment or medications given to Mr. Pollard.

Although the plaintiffs do not raise specific arguments based on the medical care received by the other patients, Dr. Taylor did state that the need for PRN medications would have been lowered if the hospital environments had been more effectively managed. (Taylor Tr. 9/10/96 at 121.) [22] That assessment does not rise to the level of a constitutional violation. Further, the defendants produced expert testimony explaining that each of the named plaintiffs received medical care pursuant to the considered judgment of treating professionals. (*See, e.g.,* Triesman Tr. 3/5/97 at 349 (re: Mr. Karn), 385–86 (re: Mr. Pollard), 401 (re: Mr. Puffinberger); Lyketsos Tr. 4/1/97 at 21–24 (re: Ms. Jackson); Janofsky Tr. 6/12/97 at 24 (re: Mr. Trail); Schretlen Tr. 6/23/97 at 59 (re: Mr. Chance), 68–74 (re: Mr. Biggs), 86 (re: Ms. Kemble); Brandt Tr. 3/6/97 at 601–05 (re: Mr. Cullen); Cassidy Tr. 12/11/96 at 46–47 (re: Ms. Lentz); Joseph Tr. 4/9/97 at 27 (re: Mr. Williams).) Dr. Cassidy asserted that the "medication management was quite conservative ... there was a very conscious attempt, I believe, on the part of the psychiatrist[s] ... to use as few medications as possible at relatively low doses." (Cassidy Tr. 12/11/96 at 43–44.) Accordingly, the court finds that the medical treatment received by the representative plaintiffs met the minimum constitutional criteria.

---

**22.** " 'PRN' in prescriptions is an abbreviation for *pro re nata,* a Latin phrase meaning 'as needed.' The times of administration are de-

termined by the needs of the patient." MOS-BY's MEDICAL & NURSING DICTIONARY 888 (1983).

*Safety*

■ Under *Youngberg*, the State "has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. As defined by the lower court in *Thomas S. III*, that liberty interest "encompasses reasonable protection from aggression by others, protection from self-abuse which can be prevented, and the proper use of basic adaptive equipment and techniques to reduce the risk of physical deterioration . . . ." 699 F.Supp. at 1200.

In support of their contention that the plaintiffs were not kept reasonably safe, the plaintiffs do not argue that the State failed to use professional judgment in providing a safe environment. Rather, they contend that the patients were not kept reasonably safe because the hospitals could not provide an appropriate environment or level of supervision to prevent the plaintiffs from assaulting others, engaging in harmful behavior, or falling. The argument was presented in this manner both in the plaintiffs' papers and at trial. (*See* Pls.' Post–Trial Br. at 59–60; Pls.' Post–Trial Reply at 69–71.) Dr. Taylor testified that the patients suffered injuries as a result of the hospital environments because chaotic surroundings caused them to act out. (Taylor Tr. 9/9/96 at 43–45, 75–76.) He stated further that the hospital environment "is insufficient and promotes—and lends itself to recurrent episodes of agitation and aggression . . .", (*Id.* at 86), and that more staff was needed to supervise the patients. (*Id.* at 59.)

Similarly, Dr. Culotta testified that the chaotic environments in the state hospitals subjected the plaintiffs to an unacceptable risk of harm because they were inappropriately managed for TBI patients. (Culotta Tr. 10/21/96 at 16.) Further, as a result of what he perceived as inadequate behavioral management plans and therapeutic activities, Dr. Culotta found that the plaintiffs were subject to harm in the form of assaults, in addition to seclusion and loss of dignity. (Culotta Tr. 10/22/96 at 108.) Finally, Dr. Scott testified that keeping Mr. Williams at Perkins after he was ready for discharge subjected him to "a very real risk of physical injury." (Scott Tr. 9/12/96 at 41–42.) He also acknowledged, however, that the risk was not realized and that Mr. Williams did not suffer any serious injuries while at Perkins. (*Id.*)

In addition, the plaintiffs have provided evidence of injuries suffered by the patients while they were hospitalized. These injuries are described in the earlier general background section for each patient. In their post-trial brief, however, the plaintiffs make specific arguments about the injuries suffered by several of the patients. First, they state that Ms. Lentz was assaulted frequently and suffered "lacerations requiring sutures, a fractured finger, scratches, bruises and abrasions, a bloodied nose, a shoulder fracture, and a right hip fracture . . . ." (Pls.' Post–Trial Br. at 71–72.) Apparently, she was assaulted after stealing belongings from other patients. The plaintiffs argue, however, that those stealing impulses could have been better controlled, thereby reducing the number of times Ms. Lentz was assaulted, if the environment at Springfield had been managed more effectively. (*Id.* at 72; Taylor Tr. 9/9/96 at 51–52.)[23] Similarly, the plaintiffs argue that the patients' self-injurious behavior, such as Ms. Kemble's

---

**23.** In this section, the plaintiffs also list instances in which Mr. Cullen, Ms. Jackson, and Mr. Williams were assaulted, but do not make any separate argument based on those occurrences. (Pls.' Post–Trial Br. at 72–73.)

rectal digging and Ms. Jackson's "sexually inappropriate behavior," could have been lessened by more effective management of the hospital environment and increased supervision. (Pls.' Post–Trial Br. at 73–75.)

 It is true, and unfortunate, that the representative plaintiffs suffered injuries while they were hospitalized. Those injuries, however, do not necessarily indicate a constitutional violation. Neither is a constitutional violation indicated by proof that the hospitals could have managed the environment more effectively to reduce those injuries or that the plaintiffs suffered fewer injuries in community placements. Rather, to prove a constitutional violation, the plaintiffs must show that the State abdicated its responsibility to "take thought and make reasonable provision for [their] welfare." *County of Sacramento,* 523 U.S. at 852 n. 12, 118 S.Ct. at 1719 n. 12. The plaintiffs cannot meet that standard.

The defendants' expert, Dr. Treisman, testified at trial that

> everybody makes mistakes handling difficult patients. There are falls in every hospital I have ever been affiliated with and every place I visited. There are also restrictions placed on patients. You can't know if you are too restrictive unless somebody falls down. You can't know if you are not restrictive enough unless someone falls down.

(Treisman Tr. 3/5/97 at 415–16.) Similarly, Dr. Brandt testified that treatment methods are "always a balance, a balance of allowing the patient to engage in as normal a life as possible and keeping them safe." (Brandt Tr. 3/6/97 at 602.) Likewise, Dr. Janofsky stated that the hospitals have to balance "the need to contain Mr. Trail to keep him safe, to keep him from hurting others, with the need for safety and security." (Janofsky Tr. 6/12/97 at 27.)

Those experts also stated that, in their opinions, the hospitals had considered the relevant factors and struck an appropriate balance. Dr. Treisman stated that Mr. Karn was "kept reasonably safe" and that, although one could disagree with the balance that was struck between safety and freedom, it "was considered, thoughtful and reevaluated regularly." (Treisman Tr. 3/5/97 at 361–62.) He also stated that Mr. Pollard was kept "very" safe in the hospital. (*Id.* at 391.) Similarly, Dr. Janofsky opined that Mr. Trail was kept "extremely safe" and that the Perkins "staff did an incredible job in minimizing other patients' risk from Mr. Trail and . . . helping Mr. Trail maintain his dignity . . . ." (Janofsky Tr. 6/12/97 at 28, 30.) Dr. Brandt testified that the balance struck between freedom and safety for Mr. Cullen was appropriate, and re-evaluated regularly. (Brandt Tr. 3/6/97 at 603.) Additionally, Dr. Schretlen stated that Mr. Chance, Mr. Biggs, and Ms. Kemble were kept reasonably safe, (Schretlen Tr. 6/23/97 at 58–59, 72, 86), and Dr. Cassidy testified that he saw nothing unusual about the number of injuries suffered by the plaintiffs. (Cassidy Tr. 12/11/96 at 67–68.) All of those experts were credible, well-qualified, and supported their opinions persuasively.

Thus, the defendants have shown that the decisions regarding the patients' safety were made after careful consideration and based on the recommendations of hospital staff. The plaintiffs have not shown that these decisions resulted in conditions that were so unsafe as to violate their due process rights. The fact that safer conditions might exist elsewhere does not render the state hospitals constitutionally deficient. Accordingly, the court finds no violation of the plaintiffs' due process right to be kept reasonably safe.

*Reasonable Freedom from Bodily Restraint*

 Under *Youngberg,* the State "may not restrain residents except when

and to the extent professional judgment deems this necessary to assure ... safety or to provide needed training." *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462. In addition to mechanical restraints, such as tying or strapping a person to a bed or chair, the restriction on unnecessary restraint may extend to seclusions in a "quiet room" and chemical restraints in which patients are sedated regularly rather than treated. *See, e.g., Thomas S. III,* 699 F.Supp. at 1188–89.

It is undisputed that the hospitals used mechanical restraints to control many of the patients when they became overly agitated, to protect them from themselves, and to prevent them from harming other patients. As described above, Mr. Chance, Ms. Jackson, Ms. Kemble, Ms. Lentz, Mr. Trail, and Mr. Williams were subjected to 2– or 4–point restraints at times during their tenures in the state hospitals. In addition, Mr. Puffinberger and Ms. Kemble were restrained using a geri-chair and posey vest to prevent them from harming themselves. (*See id.*) Finally, almost all of the named plaintiffs were secluded, in varying frequencies and for varying lengths of time, as a form of behavior modification. (*Id.*)

The plaintiffs argue that restraints and seclusion were inappropriate for these patients because they were used to the exclusion of other treatment options. Dr. Taylor testified that using seclusion and restraint without developing other management techniques constituted a lack of professional judgment. (Taylor Tr. 9/9/96 at 94.) He did not, however, analyze the specific instances in which restraints or seclusion were used to determine their appropriateness. (*Id.*) Similarly, Dr. Culotta criticized the use of restraints and seclusion for Mr. Biggs (Culotta Tr. 10/21/96 at 65–66; Culotta Tr. 10/22/96 at 115–16), Ms. Lentz (*id.* at 115–16), Mr. Puffinber-

ger (*id.* at 117–18), Mr. Cullen (*id.* at 119), and Ms. Kemble (*id.* at 121–125). He claimed that the restraints were inappropriate because they did not "allow the patient to learn some adaptive skill" and because they were "often used prior to attempting a less restrictive technique." (*Id.* at 116.)

Dr. Culotta also testified about the treatment received by Ms. Lentz when she was first hospitalized. Because they were unable to control her compulsive stealing, the hospital staff put Ms. Lentz in mitten restraints for six hours every time she stole. (Culotta Tr. 10/21/96 at 56–58; Pls.' Trial Ex. L–37.) When that proved ineffective, the staff began tying her wrists to a hip belt for six hours each time she stole. (Culotta Tr. 10/21/96 at 58; Pls.' Trial Ex. L–38.) Dr. Culotta stated that the use of mittens and hand restraints for Ms. Lentz, in addition to the geri-chair and posey vest for Mr. Puffinberger and the stationary chair for Mr. Biggs, violated Maryland regulations because they were used "as a mode or course of treatment." (Culotta Tr. 10/22/96 at 116.) The evidence shows, however, that Ms. Lentz was not placed in mitten or wrist restraints before 1986 or after 1988. (Culotta Tr. 10/22/96 at 248; Defs.' Summ. of Evid. at 40.) Thus, the use of those restraints was discontinued more than six years before this lawsuit was filed, and there is no evidence that the hospitals intended to subject Ms. Lentz to them again. Moreover, the regulations to which Dr. Culotta referred were not enacted until 1993. (Culotta Tr. 10/22/96 at 249; Defs.' Trial Ex. G–2; MD. REGS. CODE tit. 10, subt. 21, ch. 12 (2001).)

In addition, when Mr. Biggs was confined to the stationary chair during "time outs," he was not physically restrained and could stand up if he chose. (Meade Tr. 4/8/97 at 34–35; Schretlen Tr. 6/23/97 at

136–37.) [24] No seclusion or restraint was necessary to control Mr. Biggs. (Schretlen Tr. 6/23/97 at 70.) Dr. Schretlen testified that the chair "was a creative kind of solution because they were able to avoid secluding him and avoid restraining him in other ways .... He never struggled to go sit in the stationary chair. He didn't mind it ...." (*Id.* at 71.) Thus, the stationary chair reflected the considered judgment of the treatment staff as a way to avoid seclusion and restraint of Mr. Biggs.

Dr. Treisman acknowledged that the geri-chair and posey vest were a form of restraint for Mr. Puffinberger. (Treisman Tr. 3/5/97 at 403.) Those restraints, however, were used to protect Mr. Puffinberger from hurting himself by trying to get up, and to protect the other patients from being run over or rammed by Mr. Puffinberger when he was in a wheelchair. (*Id.* at 401–05.) Dr. Culotta agreed that the use of the geri-chair and posey vest was appropriate initially, but stated that "the prolonged use ... constituted a form of inappropriate restraint." (Culotta Tr. 10/22/96 at 240.) Conversely, Dr. Treisman testified that the risks and benefits were considered appropriately in determining that Mr. Puffinberger should be kept in the chair and vest. (Treisman Tr. 3/5/97 at 405.) He stated that, as alternatives to the posey vest and geri-chair, the hospital could have kept Mr. Puffinberger safe by keeping him in 6–point restraints continuously or surrounding him by staff on four sides at all times. (*Id.* at 401, 405.) The chair and vests were preferable, according to Dr. Treisman, because they allowed him freedom to move his arms and legs. (*Id.* at 404.) In sum, the geri-chair and posey vest struck an appropriate bal-

ance between "restraint and safety." (*Id.* at 405; *see also* Cassidy Tr. 12/11/96 at 69.) The court agrees with this assessment and concludes that the plaintiffs have not shown that the restraints used with Mr. Puffinberger violated his due process rights.

Similarly, the defendants produced expert testimony proving that the seclusions and restraints used for the other representative plaintiffs were based on appropriate professional judgment. Dr. Cassidy testified that the staff at the hospitals he visited "spent a lot of time thinking about" the restraints used on the patients. (Cassidy Tr. 12/11/96 at 68–69.) He also stated that it was appropriate to keep Mr. Chance restrained for longer periods of time than the TBI patients because he could understand why he was being restrained. (*Id.* at 58–60.) Similarly, Mr. Cullen could be restrained for longer periods of time if he remained agitated. (*Id.* at 61.) He found no examples of restraints or seclusion being used as a form of punishment. (*Id.* at 65.)

Dr. Treisman testified that the restraints and seclusions were appropriate for Mr. Karn and Mr. Pollard. (Treisman Tr. 3/5/97 at 369–70, 392–93.) He stated that, unlike hospitals in other states with which he was familiar, neither restraints nor seclusions were used to allow the staff time away from the patients; they were used only when necessary to calm the patients. (*Id.* at 369–70.) Dr. Janofsky testified that the staff "did an incredible job" with Mr. Trail and that the seclusions and restraints used were both necessary and appropriate. (Janofsky Tr. 6/12/97 at 30, 40.) Dr. Schretlen stated that the restraints and seclusions used for Mr.

**24.** According to Dr. Schretlen, the stationary chair was "[e]ssentially a wheelchair without wheels, and it was sort of right in the middle of the unit, it wasn't seclusion but, they would have him seated there and he would usually calm down pretty quickly." (Schretlen Tr. 6/23/97 at 70.)

Chance were appropriate and were used only to keep him calm and safe and to prevent him from harming other patients. (Schretlen Tr. 6/23/97 at 52–55.) He also testified that the restraints used with Ms. Kemble were appropriate and diminished over time as her behavior improved. (*Id.* at 83.) Dr. Brandt testified that an appropriate balance was struck in the treatment of Mr. Cullen and that he was checked regularly when secluded. (Brandt Tr. 3/6/97 at 603, 610.) Finally, Dr. Lyketsos testified that the seclusions and quiet room employed with Ms. Jackson "were appropriate as part of the balance ... between harm avoidance or harm reduction and freedom." (Lyketsos Tr. 4/1/97 at 32–33.)

■ The plaintiffs have not proven that the State did not appropriately rely on the recommendations of the hospital doctors in secluding or restraining the patients. Nor has it shown that the recommendations substantially deviated from any accepted standards. Rather, the defendants' experts have shown that restraints and seclusion were used as necessary to calm or protect the patients or other residents.

■ Finally, in their post-trial brief, the plaintiffs argue that the hospitals used chemical restraints by relying too heavily on PRN medications instead of appropriate environmental or behavioral intervention. (Pls.' Post–Trial Br. at 79–80.) Dr. Taylor testified that the patients would have needed less PRN medication if the hospital environment had been managed more appropriately. (Taylor Tr. 9/10/96 at 12.) Dr. Cassidy testified, however, that

chemical restraint generally involves the use of a very sedating anti-psychotic medication, such as Thorazine, to subdue the patient or put him to sleep. (Cassidy Tr. 12/11/96 at 66–67.) He stated that, generally, chemical restraints are given intravenously and against the patient's will. (*Id.* at 67.) In this case, most of the patients were given Ativan or a similar medication orally on an as-needed basis when they became overly agitated. (*Id.* at 66–67.) Even assuming that excessive use of oral medications could amount to chemical restraint, the court finds that the use of PRN medication reflected in the plaintiffs' records does not rise to the level of a constitutional violation.

*Minimally Adequate or Reasonable Training*

■ Under *Youngberg*, the State is required to provide the plaintiffs "such training as an appropriate professional would consider reasonable to ensure [their] safety and to facilitate [their] ability to function free from bodily restraints." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. *See also Thomas S. II*, 781 F.2d at 374–75 (citing *Youngberg* for the proposition that the required level of training is based on the constitutional right being protected). In this case, the training, or "habilitation" sought by the plaintiffs encompasses activities and therapies, as well as behavior management plans that they claim were required to help manage and improve their behaviors.[25]

25. " 'Habilitation' is the process of helping a person with mental retardation to acquire needed self-care skills. The term refers specifically to the needs of mentally retarded individuals." *Thomas S. III*, 699 F.Supp. at 1192 (citing *Youngberg*, 457 U.S. at 309 n. 1, 102 S.Ct. at 2454 n. 1). *See also* Md.Code Ann., Health–General § 7–101(i) (2000) (de-

fining habilitation in the context of developmentally disabled patients). Technically, therefore, the term may be used inappropriately in this case as mentally retarded patients have been excluded from the suit. Because it appears in the plaintiffs' briefs, however, the court will use the term in the manner in which the plaintiffs employ it.

The plaintiffs' experts argued extensively that the therapies, activities, and management plans available for the plaintiffs were inadequate. In addition, they claimed that the hospital environment simply was too noisy and chaotic to offer appropriate treatment to these patients. According to Dr. Taylor, the "fundamental" problem with the hospitals was that the environments were not managed in a way to mitigate the TBI-induced behaviors. (Taylor Tr. 9/9/96 at 44–45.) He testified that patients with TBI could not adapt to the hospital environments and, accordingly, could not improve their behaviors. (*Id.* at 47–52.) In his opinion, the hospitals were too disorganized and noisy to treat patients with TBI appropriately. (*Id.* at 65–66.) Similarly, Dr. Culotta testified that "the patients were inappropriately hospitalized in an overly restrictive environment, not designed to meet the needs of individuals with neurobehavioral disorders or brain injury." (Culotta Tr. 10/21/96 at 16; *see also id.* at 75–76.) Additionally, both Dr. Taylor and Dr. Culotta stated that the patients were provided an insufficient number of structured activities to help mitigate their behaviors. (Taylor Tr. 9/9/96 at 69–70; Culotta Tr. 10/21/96 at 74–75; Culotta Tr. 10/22/96 at 96–97, 101.)

Both Dr. Taylor and Dr. Culotta also testified that the treatment standards required the hospital to design a behavior management plan for each patient. Dr. Taylor stated that the first step in developing such a plan was a "functional analysis" in which the treatment team developed an understanding of the patient's behavior and the environmental stimuli that caused and maintained it. (Taylor Tr. 9/9/96 at 71.) Once the functional analysis was conducted, Dr. Taylor stated that the treatment team should have developed an appropriate behavior management plan to address those behaviors. (*Id.* at 72.) Dr. Culotta echoed this testimony. (Culotta Tr. 10/21/96 at 42–44.) He also stated that the goal of a behavior management plan is to diminish negative behaviors and develop a patient's skills, thereby diminishing the harm to the patient and increasing his "repertoire and control." (*Id.*) [26]

Dr. Taylor testified that a few of the patients had functional analyses and that there were several instances "in which a behavioral management plan was offered up and implemented to some extent, but" those plans were not implemented consistently. (Taylor Tr. 9/9/96 at 56, 72–73.) Similarly, Dr. Culotta testified that none of the patients he evaluated had a functional analysis and that the behavior management plans "were either absent or inadequately developed." (Culotta Tr. 10/21/96 at 44, 46.) Specifically, he stated that Mr. Cullen and Mr. Pollard did not have behavior management plans but needed them, (*id.* at 46, 52–53), and that the behavior management plans implemented for Ms. Jackson and Ms. Lentz were inadequate. (*Id.* at 54–56; Culotta Tr. 10/22/96 at 103.)

The defendants' experts do not agree with those assessments. First, they disagreed that the hospitals were too chaotic or noisy to effectively manage TBI patients. Dr. Treisman stated that the hospital is "quite structured" and well managed. (Treisman Tr. 3/5/97 at 360–61.)

---

**26.** As the term was used by the experts in this case, a behavior management plan, or behavior modification program, is a tool which may be used to help correct or mitigate patients' behaviors. It usually involves a token economy whereby the patient is rewarded, for example with a cigarette, for good behavior. (Janofsky Tr. 6/12/97 at 37, 73.) A behavior management plan may be part of the hospital's individual treatment plan for a particular patient.

Dr. Cassidy stated that the hospitals were "clean [and] well kept .... By and large the patients were engaged in activities. The staff were out with the patients.... The staff genuinely cared for these individuals." (Cassidy Tr. 12/11/96 at 50–51.) He further asserted that the hospitals were not chaotic and ranked "as some of the best I have ever been in." (*Id.* at 52.) Dr. Janofsky also testified that the hospital environment was not chaotic and that, although Perkins could be noisy at times, the noise was not a problem for Mr. Trail. (Janofsky Tr. 6/12/97 at 27–28.) Finally, Dr. Brandt testified that the hospital was not noisy, chaotic, or overly crowded. (Brandt Tr. 3/6/97 at 600.)

The defendants' experts also disagreed that formal behavior management plans are required for these patients. Dr. Joseph stated that behavior management plans are not necessary because patients with TBI may not be able to learn in that way. (Joseph Tr. 4/9/97 at 34; *see also* Defs.' Summ. of Evid. at 44–45.) Similarly, Dr. Cassidy testified that having behavior management plans for a group of patients like this one

> would be relatively uncommon. Because token economies involve or require the ability of the patient to be aware that the token is representative of something else. And for patients that are significantly encephalopathic, ... the token has no meaning for them whatsoever. And as a consequence of that, you can give them tokens all day and night, and it has absolutely no relevance to them because they can't remember that they are tied to a backup reinforcer.

(Cassidy Tr. 12/11/96 at 91.) Thus, because many TBI patients might not be able understand a token economy, a behavior management plan would not help them control their behaviors. Many of the NRDD patients, such as Mr. Trail, on the

other hand, could learn behaviors. (Janofsky Tr. 6/12/97 at 35–38.) According to Dr. Janofsky, a behavior management plan might be helpful for those patients and, indeed, a plan was implemented for Mr. Trail. (*Id.*)

Further, Dr. Lyketsos testified that, although it might not help, a behavior management plan might be tried in the spirit of "therapeutic optimism." (Lyketsos Tr. 4/1/97 at 21.) Specifically, he stated:

> I think therapeutic optimism, which is try everything you can with someone like this, is very appropriate. I think this is the way to do it. There is not enough scientific research to tell you what to do, so you have to practice it very much like an art, and you try pretty much everything that is safe to try after you discuss it with the patient and they have a sense of why you are doing things and what you are doing.

(*Id.*) Thus, though behavior management plans might be tried, they were not required to afford these patients constitutionally sufficient training.

Moreover, the hospitals developed individual treatment plans for each of the plaintiffs, and some of those programs included behavior management plans. (Cassidy Tr. 12/11/96 at 88–89; *see also* Defs.' Summ. of Evid. at 45.) The individual treatment plans addressed the patients' behavior, activities, and goals, and in many cases, resembled specific behavior management plans. (Defs.' Summ. of Evid. at 45–46.) As Dr. Treisman testified, those plans "are designed to improve their quality of life, function, longevity, something that would be missed in a place that simply stuck patients away, which unfortunately in many states is all that is available to patients." (Treisman Tr. 3/5/97 at 473.)

Dr. Treisman also testified that Springfield was managing Mr. Karn's behavior appropriately, and providing appropriate

structure for Mr. Pollard and Mr. Puffinberger. (*Id.* at 346, 365–66, 398, 407–08.) Dr. Lyketsos stated that Springfield "had in place a fairly sophisticated treatment plan" for Ms. Jackson. (Lyketsos Tr. 4/1/97 at 19.) Dr. Schretlen stated that the treatment plan for Mr. Chance was appropriate and that his doctors "did just such a marvelous job with this young man." (Schretlen Tr. 6/23/97 at 48, 55–56.) He also testified that there were appropriate management plans for Mr. Biggs and Ms. Kemble. (*Id.* at 70, 82.) Dr. Brandt stated that Mr. Cullen received appropriate treatment at the hospital. (Brandt Tr. 3/6/97 at 605.)

Thus, the fact that behavior management plans were not included in the treatment plan for each of the plaintiffs or were not implemented effectively in each case, does not render the training or habilitation offered by the hospitals constitutionally deficient. The plaintiffs cannot establish that the perceived lack of training prevented them from being kept reasonably safe or free from unnecessary restraint. Again, the fact that a behavior management plan might have made improvements in the behavior of one or more of the patients does not establish a constitutional deprivation.

Similarly, the plaintiffs have not established that the therapies and activities provided by the hospitals were so lacking as to violate their due process rights. Each of the plaintiffs was involved in a number of activities at the hospitals, and the defendants' experts testified that these activities were managed appropriately. (*See* Treisman Tr. 3/5/97 at 371 (re: Karn), 394 (re: Pollard), 407–08 (re: Puffinberger); Lyketsos Tr., 4/1/97 at 33–34 (re: Jackson); Schretlen Tr. 6/23/97 at 58 (re: Chance), 84 (re: Kemble); Brandt Tr. 3/6/97 at 611 (re: Cullen).) The fact that more activities might have been provided if additional funding were available does not render those currently provided constitutionally deficient. Accordingly, the court finds no due process violation.

In addition, the plaintiffs claim that the staff at the state hospitals lacked the necessary training and experience to provide proper treatment for TBI patients. Although staff training was not discussed in *Youngberg*, the plaintiffs derive this requirement from the statement in *Thomas S. III* that "[p]roperly trained staff are also a prerequisite to providing developmental habilitation." 699 F.Supp. at 1192. The court need not decide whether this requirement, which was established in the context of a class of mentally retarded patients, is applicable equally to the class of TBI and NRDD patients in this case.[27] Rather, assuming that properly trained staff are required, the court finds that the plaintiffs have not proven a constitutional violation.

Dr. Culotta testified that "there were severe inadequacies in the training and experience of staff members providing services for TBI patients." (Culotta Tr. 10/21/96 at 33.) For the "professional" staff, Dr. Culotta stated that "the minimally adequate ... level of training would include some formal course work at a university level, attendance at seminars ..., and some sort of ... supervised experience in treating and managing patients with brain injury." (*Id.* at 32.) For "nonprofessional" staff, an extensive orientation

---

**27.** The distinction may be important because the experts disagreed whether, and for how long after the injury was suffered, patients with TBI can recover or "learn" new behaviors. (*See, e.g.,* Culotta Tr. 10/22/96 at 154– 56; Cassidy Tr. 12/11/96 at 88–89.) If the patients cannot improve their behaviors, a lower level of expertise may be required to care for them than is necessary to treat mentally retarded patients.

and supervised training would suffice. (*Id.* at 32–33.) He stated that this training is necessary because TBI patients need "a different level of treatment, a different approach to their environment, and have vastly different etiologies to their behavioral disorders" than other mentally ill patients. (*Id.* at 35.) He met with hospital staff who told him that their training had been inadequate. (*Id.* at 36–40.) When asked about the training that was provided by the hospitals, Dr. Culotta stated that

it was inadequate in part because of its limited amount of time for the seminars . . . . Simply isolated lectures like that doesn't constitute in my opinion minimally acceptable training to treat patients with a brain injury. The training provided no follow-up, mentorship, preceptorship . . . . It provided no relationship with consulting professionals.

(*Id.* at 41.) Dr. Culotta did not know the level of training received by the staff at the community placements. (Culotta Tr. 10/22/96 at 219–20.)

Further, Dr. Taylor testified that the staff treating the patients did not "possess . . . sufficient training . . . nor expertise . . . to give adequate treatment . . . ." (Taylor Tr. 9/9/96 at 28.)

The defendants' experts refuted this criticism. Dr. Janofsky testified that the Perkins staff "are the real experts in taking care of folks with violent behaviors . . . and persons suffering with mental disorders . . . in a caring and therapeutic way, and that was certainly true with Mr. Trail's staff." (Janofsky Tr. 6/12/97 at 44.) He found the training and planning for Mr. Trail's care appropriate. (*Id.* at 45–46.) Similarly, Dr. Lyketsos stated that

state hospital staff and environments have had the most experience in taking care of these particular patients. So I think the level of training is quite adequate. In many cases it's better than

anybody else has simply because they have had the experience with these very difficult patients.

(Lyketsos Tr. 4/1/97 at 35.) With respect to Ms. Jackson, he testified that patients like her "have been around for a while . . . and essentially they have been in the state hospitals . . . And these are the staff members who have been taking care of these patients. They do a good job at it. They have the most experience with it." (*Id.* at 34.) Dr. Brandt opined that the hospital staff had the appropriate expertise to treat Mr. Cullen based on their past experience with difficult patients. (Brandt Tr. 3/6/97 at 612.)

Both Dr. Brandt and Dr. Schretlen acknowledged that some members of hospital staff may have felt that they needed more training. (Brandt Tr. 3/6/97 at 612–13; Schretlen Tr. 6/23/97 at 73.) Both, however, also stated that the staff members were more competent than, perhaps, they thought. Dr. Schretlen testified that, in his opinion, the staff did not feel that "they were as qualified to provide the care as . . . they were." (Schretlen Tr. 6/23/97 at 73.) Although the staff members apparently thought that there "was some expertise out there that they didn't have that would enable them to provide better care," no such expertise existed. (*Id.*) Similarly, Dr. Brandt testified that some of the staff "believed that they were not as expert or as skilled as they were. I think they assumed that there is this wealth of expertise out there that they didn't have. And they really do. They know what they are doing." (Brandt Tr. 3/6/97 at 613.) Finally, Dr. Lyketsos testified that, although much of the staff did not have specific training in managing patients with TBI, that lack of training did not adversely affect their care for Ms. Jackson. (Lyketsos Tr. 4/1/97 at 34–35.)

Based on that testimony, the court cannot find that the staffs at the state hospitals were so undertrained as to deprive the patients of their due process rights. Even if additional training would have benefitted the staff members and patients in some way, that failure does not rise to the level of a constitutional deprivation, because the plaintiffs have not shown that it prevented the hospital staff from keeping them safe or free from undue restraint.

*Community Treatment*

In addition to the requirements described above, the plaintiffs contend that the patients "have a constitutional right to treatment in accordance with the judgments of their treating clinicians." (Pls.' Post–Trial Br. at 51.) In support of this argument, the plaintiffs rely on the *Thomas S.* line of cases for the proposition that "the State must implement discharge and community placement recommendations unless it can show that those recommendations are a substantial departure from accepted professional judgments, practices or standards." (*Id.* at 53.)

Accordingly, the plaintiffs argue that the State's failure to provide funding for community placements violated the patients' due process rights. (Pls.' Post–Trial Br. at 53–55.) In support of this argument, they rely on the court's finding in *Thomas S. III* that a constitutional violation occurs when "institutional confinement results from an absence of appropriate alternatives and is not based on professional judgment." *Id.* at 53 (citing *Thomas S. III,* 699 F.Supp. at 1191). In making this argument, however, the plaintiffs have interpreted both *Youngberg* and the *Thomas S.* cases too broadly. While the State is presumed to have satisfied its constitutional duties if it follows the recommendations made by its treating professionals, *Youngberg,* 457 U.S. at 321–24, 102 S.Ct. at 2461–62, showing that the treatment team made recommendations that were not immediately implemented is insufficient to prove a constitutional violation under *Youngberg.* While the State may not confine patients to mental institutions who do not belong there simply because it is financially or politically expedient to do so, *see Thomas S. III,* 699 F.Supp. at 1196; *Thomas S. II,* 781 F.2d at 375, it is sufficient if a state acts reasonably to implement community placement, without arbitrary or undue delay in light of legitimate budget constraints and the competing demands of other disabled citizens. As discussed below in connection with the ADA, the State has met that standard.[28]

## II. ADA

The plaintiffs also bring a claim under Title II of the ADA which provides that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

---

**28.** Further, even if some of the plaintiffs could show such delay, they would not be entitled to prospective injunctive relief. Mr. Williams and Mr. Cullen, for example, whose placements were significantly delayed, had been successfully placed in community programs before the close of evidence in this case. (Pls.' Post–Trial Reply, App. F–2, F–10.) They did not show any "lingering effects" of the time spent in the hospital or "inappropriate community placements" such as to justify injunctive relief. *See Thomas S. IV* at 254. To the contrary, the community placements apparently have been quite successful. (*See, e.g.,* Ali Tr. 9/12/96 at 126–38; Brandt Tr. 3/6/97 at 634–35 (describing Williams and Cullen placements).)

42 U.S.C. § 12132. To state a *prima facie* case under this section, a plaintiff ordinarily must show:

> 1) that he is a qualified individual with a disability;
>
> 2) that he is otherwise qualified for the benefit in question; and
>
> 3) that discrimination due to his disability served as a motivating factor in his exclusion from the benefit.

*Pathways Psychosocial v. Town of Leonardtown,* 133 F.Supp.2d 772, 781 (D.Md. 2001) (citing *Baird v. Rose,* 192 F.3d 462, 467 (4th Cir.1999)). *See also Williams,* 937 F.Supp. at 528. If the plaintiff states a *prima facie* case and "requests relief that requires modification of a State's services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs." *Olmstead v. L.C.,* 527 U.S. 581, 607, 119 S.Ct. 2176, 2190, 144 L.Ed.2d 540 (1999) (Stevens, J. concurring). *See also* 28 C.F.R. § 35.130(b)(7) (2001). In this case, the defendants do not dispute that the representative plaintiffs are disabled or that the named defendants are public entities under the ADA. (Defs.' Summ. of Evid. at 3.)[29] The focus, therefore, is on the latter two prongs of the *prima facie* test and the defendants' fundamental alteration defense.

The Supreme Court confronted a very similar situation in *Olmstead v. L.C.* The plaintiffs were two mentally retarded women, one with paranoid schizophrenia and the other with a personality disorder, who had been treated in mental institutions. 527 U.S. at 593, 119 S.Ct. at 2183. They sued the state alleging that the failure to place them in community-based treatment programs violated the ADA. The Supreme Court found that the two women were entitled to be placed in community-based programs and affirmed the Eleventh Circuit's remand to the district court to consider the state's cost-based defense. Justice Ginsburg summarized the Court's ruling as follows:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.[30]

*Olmstead,* 527 U.S. at 607, 119 S.Ct. at 2190. The *Olmstead* opinion will form the basis for this court's analysis of the representative plaintiffs' claims.

*Otherwise Qualified for the Benefit in Question*

The ADA defines "qualified individual with a disability" to mean:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

---

**29.** The statute defines the term "public entity" to include any state or local government and "any department, agency, special purpose district, or other instrumentality" of a state or local government. *Id.* § 12131(1). *See also Olmstead,* 527 U.S. at 590, 119 S.Ct. at 2182; *Smith–Berch, Inc. v. Baltimore County,* 68 F.Supp.2d 602, 617 (D.Md.1999).

**30.** The section of Justice Ginsburg's opinion describing the standards to be employed when analyzing a cost-based defense was joined by only four members of the Court. *See infra* section entitled "Affirmative Defense: Fundamental Alteration."

42 U.S.C. § 12131(2). The parties disagree whether the representative plaintiffs met the "essential eligibility requirements" for placement in community-based treatment facilities. Although there was no dispute on this point in *Olmstead*, the Court did provide some guidance. 527 U.S. at 602–03, 119 S.Ct. at 2188. It stated that, as long as the patients do not oppose community-based placement,

> the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting.

*Id.* at 602, 119 S.Ct. at 2188. This qualification was deemed appropriate in light of the regulatory directive that "[a] public entity shall administer services, programs, and activities in the most integrated setting *appropriate* to the needs of qualified individuals with disabilities." *Id.* (quoting 28 C.F.R. § 35.130(d)(emphasis in original)).[31] The Court did not explain, however, the standards that should be used to determine whether a state appropriately relied on the "reasonable assessments" of its professional employees.

The defendants make three arguments in support of their contention that the representative plaintiffs were not otherwise qualified for placement in a community-based program. (Defs.' Mem. of Law on *L.C. v. Olmstead* at 9–11.) First, they argue that hospital environments are "at least as 'integrated' as a community placement, if not more so." This argument finds little support in case law or the record (*but see* Cassidy Tr. 12/11/96 at 103–05) and may be rejected without further discussion in light of the court's other rulings. Second, they argue that the named plaintiffs did not qualify for community-based treatment because their treatment needs were too specialized to be met in "ordinary 'community placements.'" (Defs.' Mem. of Law on *L.C. v. Olmstead* at 10; Defs.' Summ. of Evid. at 80–82.) Finally, the defendants argue that the plaintiffs have not shown that the state's medical professionals determined that the plaintiffs met "the essential eligibility requirements" for community-based treatment (Defs.' Mem. of Law on *L.C. v. Olmstead* at 10–11; Defs.' Summ. of Evid. at 85, 89–92.) In their supplemental post-trial brief, the plaintiffs dispute the latter contentions by arguing that they were eligible for community-based treatment based on the state's doctors' recommendations.

The court will assume for purposes of this opinion that the representative plaintiffs, with at least one exception (Mr. Chance) were "otherwise qualified" for community-based treatment. This conclusion is supported by the facts set forth above summarizing the recommendations made by treating professionals and the eventually successful community placements found for a majority of the plaintiffs.[32] The fact that existing placements often were not sufficient to meet the plaintiffs' needs, however, requiring the development and funding of individualized programs by providers, is relevant to the state's fundamental alteration defense as discussed below.

---

**31.** This regulation is modeled after 28 C.F.R. § 41.51(d) (1998), which was implemented pursuant to Section 504 of the Rehabilitation Act of 1973. *See Olmstead*, 527 U.S. at 591–92, 119 S.Ct. at 2182–83.

**32.** As noted earlier, neither Mr. Trail nor Mr. Puffinberger could successfully be placed in the community, even with funding.

*Discrimination By Reason of Disability*

The plaintiffs argue that the state has discriminated against them by secluding them in a mental hospital when they are entitled to be in community-based treatment. This seclusion, they argue, violates the regulatory directive to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Specifically, they point to the regulation's definition of "the most integrated setting appropriate to the needs of qualified individuals with disabilities" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead,* 527 U.S. at 592, 119 S.Ct. at 2183 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

The Court in *Olmstead* confronted this question directly and concluded that, in this context, "[u]njustified isolation ... is properly regarded as discrimination based on disability." 527 U.S. at 597, 119 S.Ct. at 2185. Significantly, in reaching this conclusion, the Court rejected the argument that, to show discrimination, the plaintiffs had to identify a "comparison class" of "similarly situated individuals given preferential treatment." *Id.* at 598, 119 S.Ct. at 2186. *See also id.* at 611–12, 119 S.Ct. at 2192 (Kennedy, J. concurring). Thus, the Court found that discrimination between two members of the same class was actionable under Title II. *See id.* at 598 n. 10, 119 S.Ct. at 2186 n. 10; *Makin v. Hawaii,* 114 F.Supp.2d 1017, 1033 (D.Hawai'i 1999) ("the ADA ... does not require discrimination between different groups of disabled people.") (citing *Williams,* 937 F.Supp. at 530).[33]

The Court based that conclusion on its view of the ADA's comprehensive nature and its determinations that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and that "confinement in an institution severely diminishes the everyday life activities of individuals ...." *Id.* at 600–01, 119 S.Ct. at 2187. Significantly, the Court went on to state that

> [d]issimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice.

*Id. See also Helen L. v. DiDario,* 46 F.3d 325, 333 (3d Cir.1995) (finding that "unnecessary segregation" is a form of discrimination); *Cramer v. Chiles,* 33 F.Supp.2d 1342, 1353 (S.D.Fla.1999) ("Segregation is a form of discrimination prohibited by the ADA; as a matter of law integration is affirmatively required.")[34]

Thus, under *Olmstead,* the plaintiffs can meet this requirement for Title II discrimination by showing that they remained unjustifiably institutionalized despite their eligibility for community-based treatment.

*Affirmative Defense: Fundamental Alteration*

 If the plaintiffs can meet the *prima facie* requirements to show discrimination, the public entity may be required to make reasonable modifications to its pro-

---

**33.** This conclusion appears to moot the parties' arguments based on the *Knott* class as a comparison group.

**34.** *See also Williams,* 937 F.Supp. at 530–31.

gram or service. The "reasonable-modifications regulation" provides that

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7) (1998). *See also Olmstead*, 527 U.S. at 592, 119 S.Ct. at 2183. Thus, "[i]f a plaintiff requests relief that requires modification of a State's services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs." *Olmstead*, 527 U.S. at 607, 119 S.Ct. at 2190 (Stevens, J. concurring). *See also Hahn v. Linn County, IA*, 130 F.Supp.2d 1036, 1051–52 (N.D.Iowa 2001); *Makin*, 114 F.Supp.2d at 1034 ("[I]f a state is found to have discriminated against disabled individuals through the administration of a program, it must modify the program to remedy the situation unless it can prove that any modification would fundamentally alter the program."). In this case, the defendants do not appear to ar-

gue directly that the modification, in and of itself, is unreasonable. Rather, they contend that accommodating the plaintiffs would result in a "fundamental alteration" to the existing program because it would be unmanageably expensive to accelerate the process of finding or creating community placements for TBI/NRDD patients beyond the efforts already being made.[35]

In *Olmstead*, the defendants asserted a cost-based defense to the alleged discrimination. The district court rejected the defense because, "under the ADA, unnecessary institutional segregation of the disabled constitutes discrimination *per se*, which cannot be justified by a lack of funding." *L.C. v. Olmstead*, 1997 WL 148674, *3 (N.D.Ga.1997). The Eleventh Circuit affirmed the district court's finding that unnecessary seclusion constituted discrimination due to the plaintiffs' disabilities, but disagreed that the discrimination could not be justified by a lack of funding. Accordingly, it remanded the case for further consideration of the cost-based defense. *See L.C. v. Olmstead*, 138 F.3d 893, 905 (11th Cir.1998).

As discussed above, a majority of the Supreme Court affirmed the Eleventh Circuit's conclusion that unjustified seclusion in a mental institution may constitute dis-

---

**35.** In analyzing the parallel regulation under Title III of the ADA, the Supreme Court stated that

> the statute contemplates three inquiries: whether the requested modification is "reasonable," whether it is "necessary" for the disabled individual, and whether it would "fundamentally alter the nature of" the [activity]. 42 U.S.C. §§ 12182(b)(2)(A)(ii). Whether one question should be decided before the others likely will vary from case to case, for in logic there seems to be no necessary priority among the three. In routine cases, the fundamental alteration inquiry may end with the question whether a rule is essential.
>
> Alternatively, the specifics of the claimed disability might be examined within the

context of what is a reasonable or necessary modification. Given the concession by petitioner that the modification sought is reasonable and necessary, and given petitioner's reliance on the fundamental alteration provision, we have no occasion to consider the alternatives in this case.

*PGA Tour, Inc. v. Martin*, 531 U.S. 1049, 121 S.Ct. 1879, 1893 n. 38, 149 L.Ed.2d 904 (2001). The court finds the *PGA Tour* reasoning applicable to this case, in which the defendants also rely primarily on the fundamental alteration defense. Thus, the court will analyze the fundamental alteration defense without requiring the plaintiffs to prove explicitly that the modification sought is reasonable.

crimination. A plurality of the Court, however, also reached the fundamental alteration question. Justice Stevens, who joined the Court's opinion in all other respects, did not join the fundamental alteration portion because he concluded that the question was not properly before the Court. *Olmstead,* 527 U.S. at 607–08, 119 S.Ct. at 2190 (Stevens, J. concurring). Justice Kennedy concurred with the Court's ruling, but did not join the opinion because he determined that the plaintiffs should be required to show that they were treated differently from a similarly situated group. *Id.* at 611–12, 119 S.Ct. at 2192 (Kennedy, J. concurring). Significantly, though, Justice Kennedy did signal his agreement with the plurality's fundamental alteration analysis:

> In addition, as Justice Ginsburg's opinion is careful to note, . . . it was error in the earlier proceedings to restrict the relevance and force of the State's evidence regarding the comparative costs of treatment. The State is entitled to wide discretion in adopting its own systems of cost analysis, and, if it chooses, to allocate health care resources based on fixed and overhead costs for whole institutions and programs. We must be cautious when we seek to infer specific rules limiting States' choices when Congress has used only general language in the controlling statute.

*Id.* at 615, 119 S.Ct. at 2194 (Kennedy, J. concurring). Thus, a majority of the Court rejected the district court's narrow view of a cost-based fundamental alteration defense. Further, the few courts that have confronted this question have followed the approach used in *Olmstead. See*

*Hahn,* 130 F.Supp.2d at 1052; *Makin v. Hawaii,* 114 F.Supp.2d at 1034–35. This court, while recognizing that the fundamental alteration portion of the *Olmstead* opinion was not joined officially by a majority of the Court, finds its reasoning persuasive. Thus, like the district courts cited above, the court will follow the fundamental alteration analysis provided in *Olmstead.*[36]

In *Olmstead,* the plurality rejected the Eleventh Circuit's interpretation of the reasonable modification regulation as permitting "a cost-based defense 'only in the most limited of circumstances.'" *Olmstead,* 527 U.S. at 603, 119 S.Ct. at 2188 (quoting 138 F.3d at 902). In so doing, it rejected the argument that the expense incurred in making an individual modification should be viewed against the State's entire mental health budget because doing so made it "unlikely that a State, relying on the fundamental-alteration defense, could ever prevail." *Id.* at 603, 119 S.Ct. at 2188. Similarly, simply comparing the cost of institutionalization with community-based treatment was found to be inappropriate because doing so "overlooks costs the State cannot avoid; most notably, a 'State . . . may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions.'" *Id.* at 604, 119 S.Ct. at 2189. Indeed, the ADA may not be read to require the closing of institutions because "[s]ome individuals . . . may need institutional care from time to time [and, f]or other individuals, no placement

---

**36.** In ruling on summary judgment motions, I observed that the state's placement of several plaintiffs in community based treatment slots indicated that the plaintiffs were not seeking a "fundamental alteration" in the state's program; at the same time I noted genuine disputes of material fact about cost as a "reasonable accommodation" issue. *Williams,* 937 F.Supp. at 528. The "fundamental alteration" analysis applied in this opinion obviously must reflect both the evidence at trial and the framework established by *Olmstead.*

outside the institution may ever be appropriate." *Id.* at 605, 119 S.Ct. at 2189.

Rather, the plurality stated that the State has a need to "maintain a range of facilities for the care and treatment of persons with diverse mental disabilities" and an obligation "to administer services with an even hand." 527 U.S. at 597, 119 S.Ct. at 2185. Thus,

> [s]ensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

*Id.* at 604, 119 S.Ct. at 2189. Moreover, [i]n evaluating a fundamental-alteration defense, the [court] must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably.

*Id.* at 597, 119 S.Ct. at 2185. Thus, "[t]he State's responsibility, once it provides

community-based treatment to qualified persons with disabilities, is not boundless," and the court must consider the totality of the expenses and programs undertaken by the State when evaluating the fundamental alteration defense. *Id.* at 603, 119 S.Ct. at 2188.[37]

The court will employ these standards in analyzing the defendants' cost-based fundamental alteration defense. *See Makin*, 114 F.Supp.2d at 1034–35. For that reason, it is important to examine the defendants' role in the course of de-institutionalization and development of community-based treatment programs for all Maryland citizens with mental and developmental disabilities.

The record shows that Maryland has long had a policy of supporting community-based treatment. In 1986, legislation was passed declaring it as State policy

> (4) To foster the integration of individuals with developmental disability into the ordinary life of the communities where these individuals live;

> (5) To support and provide resources to operate community services to sustain individuals with developmental disability in the community, rather than in institutions;

---

**37.** There is argument in the post-trial briefs regarding an example given by the plurality. (Pls.' Suppl. Post–Trial Br. at 4–13; Defs.' Reply at 1–2; Pls.' Resp. at 1–2.) Justice Ginsburg wrote that

> If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.... In such circumstances, a court would have no warrant effectively to order displacement of persons at the top of the community-based

treatment waiting list by individuals lower down who commenced civil actions.

*Id.* at 605–06, 119 S.Ct. at 2189–90. As I see it, this example was intended to clarify the standards explained by the plurality and does not provide the basis for a separate substantive argument. In any event, the State has established a waiting list, a waiting list equity fund, and prioritized categories of crisis resolution for providing services. (*See, e.g.* Uhl Tr. 6/10/97 at 123–124, 134–140, 169–71; Benjamin Tr. 7/25/97 at 12–13; Johnson Tr. 9/15/97 at 49; Morgan Tr. 9/15/97 at 141.) There is no indication that the failure to move people off the waiting list results from an endeavor to keep the State's institutions fully populated.

(6) To require the Administration to designate sufficient resources to foster and strengthen a permanent comprehensive system of community programming for individuals with developmental disability as an alternative to institutional care.

MD. CODE. ANN., Health–General § 7–102 (2000).[38] Consistent with this policy, as the plaintiffs have outlined in their post-trial brief, Maryland over the past ten or more years has been gradually closing institutions and expanding the number and range of community-based treatment programs it offers for people with severe disabilities. (Pls.' Post–Trial Br. at 25.) These include alternative living units ("ALU's") for one to three-person homes, small group homes for four to eight persons, and community-supported living arrangements ("CSLA's"), where drop-in staff support individuals living in their own homes. (*Id.* at 27.) Day programs in the community offering behavioral, educational, and vocational support services also were made available. (*Id.*)

Similarly, MHA has long supported the reduction of inpatient psychiatric hospital beds in favor of community-based programs. MHA policy is to serve persons with disabilities in the least restrictive, most normative and most appropriate setting. (Pls.' Trial Ex. 156, MHA Orientation Manual, at 24; Morgan Tr. 9/15/97 at 87; Cheeks Tr. 3/6/97 at 525; Helsel Tr. 3/3/97 at 67.) Maryland has been in the forefront of developing ALU's, small group homes for persons with psychiatric disabilities, and residential programs coupled with rehabilitation since the early 1980's. (Morgan Tr. 9/15/97 at 83–86; Uhl Tr. 6/10/97 at 116.) According to Dr. Georges

Benjamin, Deputy Secretary for Public Health Services for DHMH:

> [C]learly, as a matter of philosophy, we try to serve as many people in the community as we can, and we try to get people into the communities as quickly as we can. Clearly, we try to do that in a way in which people are going to be safe and effective and receive the care they need to get.

(Benjamin Tr. 7/25/97 at 17.)

The progress of de-institutionalization has been dramatic. In 1970, the State's mental hospitals had an average daily population of 7,114. (Defs.' Trial Ex. G–109.) As of September 1997, that number had declined to approximately 1200. (Morgan Tr. 9/15/97 at 95.)[39] A number of institutions have been closed, including Highland Health Facility, Thomas Wilson Center, Henryton Center, the Victor Cullen Center, and Great Oaks; many others have remained open but have been reduced in size. (Uhl Tr. 6/10/97 at 122; Johnson Tr. 9/15/97 at 15–16.) MHA was instrumental in enacting legislation to assist in the downsizing. (Morgan Tr. 9/15/97 at 109; Defs.' Trial Ex. G143.) At the same time, the provision of community treatment services has increased. (Uhl Tr. 6/10/97 at 112; Pls.' Trial Ex. 159.) Long-term savings from institutional closings have been invested in community programs. (Johnson Tr. 9/15/97 at 52–53; Morgan Tr. 9/15/97 at 141, 151; Uhl Tr. 6/10/97 at 122–23.) When budget problems have caused reductions in state hospital facilities, Maryland has tried to "hold harmless" its community programs, which "are seen as a higher priority" than the institutional programs. (Johnson Tr. 9/15/97 at 11–12.)

---

**38.** The 1986 legislation placed with DDA the responsibility for providing services to persons with other developmental disabilities in addition to those with mental retardation.

**39.** The average daily population at state residential centers under the authority of DDA declined from 2,621 in FY 1978 to 858 in FY 1994. (Defs.' Trial Ex. G 109.)

The process of downsizing coincided with the development in the 1980's of various Medicaid "waiver" programs, which permitted states to use federal funds to provide community services for persons who would otherwise have been served in a state-funded institutional placement. (Cooper Tr. 9/11/96 at 32–33, 37–39 (discussing Home & Community–Based Services waiver).)[40] Maryland has taken advantage of the HCBS waiver since the mid–1980's (Uhl Tr. 6/10/97 at 117; Meszaros Tr. 6/10/97 at 16–17) although it did not, as of 1996, have a waiver program targeted specifically at persons with TBI.[41] Maryland officials have made significant efforts to take advantage of other Medicaid waivers, including § 1115 and the rare and expensive case management program ("RECM"). (Benjamin Tr. 7/25/97 at 31–33; Morgan Tr. 9/15/97 at 161–165; Meszaros Tr. 6/10/97 at 48–53; Folkemer Tr. 6/11/97 at 21–28, 36–39, 49–50.)

This assessment of Maryland's progress in providing community services and also in closing institutions was supported not only by the defendants and their witnesses but also by plaintiffs' expert Robin Cooper, a staff member on the National Association of State Directors of Developmental Disability Services. She testified that in the

> field of development[al] disabilities, Maryland is the acknowledged leader in the

area of supporting people with what are termed severe reputations .... [That term is] really representative of a very serious set of behaviors that present challenges to people in terms of people may be aggressive or injurious to themselves or others, have very difficult behaviors that are atypical and hard to manage.

(Cooper Tr. 9/11/96 at 65.) This description applies to many of the representative plaintiffs and others in the TBI/NRDD group. Ms. Cooper further explained that:

> Maryland has pretty extensive community services. I mean their waiver alone serves 3,350 people plus their state-funded people served in the community. And [the] hospital system is pretty extensive from the reports I received. Although Maryland has made substantial movement in closing institutional beds.

(*Id.* at 90).

It appears that the state's focus on deinstitutionalization and community treatment also has been affected by the pressure of litigation. *Knott v. Hughes*, a lawsuit initiated in 1980 concerning mentally retarded individuals in institutions, led to a consent decree implementing a process for placement of those in the *Knott* class.[42] While some similarities exist between the representative plaintiffs and those in the *Knott* class, there also was evidence that *Knott* placements frequently were less ex-

---

**40.** The waiver does not cover the full cost of community services, *e.g.* room and board. (Cooper Tr. 9/11/96 at 83.)

**41.** Only fourteen states had added such waivers from 1990 to 1996. (Cooper Tr. 9/11/96 at 71.) Maryland considered but did not adopt a TBI waiver. (Meszaros Tr. 6/10/97 at 48–51; Folkemer Tr. 6/11/97 at 36–37.)

**42.** In *Knott v. Hughes*, Y–80–2832, the Maryland Disability Law Center instituted an action on behalf of persons dually diagnosed with mental retardation and mental illness,

challenging their care and treatment in state psychiatric hospitals. A class was certified that consisted of all mentally retarded persons who were then confined, or would be confined in the future, whose mental illnesses did not warrant confinement in psychiatric hospitals under Maryland law. In response to the suit, the State proposed a placement plan for the class, which established a commitment to place 270 class members out of the psychiatric hospitals. In May 1981, the court ruled that the plan was an "acceptable response" and approved the plan.

pensive and did not require the same level of supervision in the home. (McMillan Tr. 10/24/96 at 204–208; Cheek Tr. 10/24/96 at 192; Abrams Tr. 10/24/96 at 233–34.) In 1989, the statewide *Knott* class coordinator for DDA, Leslie McMillan, warned that DDA might be "vulnerable to possible litigation on behalf of the NRDD population" (Pls.' Trial Ex. 223) because "the advocacy attorneys were asking about that population in a threatening lawsuit." (McMillan Tr. 10/24/96 at 212.)[43] Planning discussions in 1990 included the possibility of diverting *Knott* class dollars to serve the NRDD population, although that was ultimately rejected. (*Id.* at 214, 217.) Also during the 1990's, following the initiation of a lawsuit (*Hunt v. Meszaros,* CCB–91–2564) the State closed Great Oaks, requiring it to find community placements for most of the Great Oaks residents. While the State expected to recognize over three million dollars in savings from this closing, it found that the cost of community placements was higher than anticipated. Approximately two million dollars eventually were saved. (Johnson Tr. 9/15/97 at 38.)

In 1994, DHMH initiated a special TBI project to develop and fund community placements. (Abrams Tr. 10/24/96 at 234; Meszaros Tr. 6/10/97 at 6–8; Uhl Tr. 6/10/97 at 155–56.) Two million dollars subsequently was identified from the State's budget for this purpose: one million from DDA and one million from MHA.[44] (Meszaros Tr. 6/10/97 at 8.) It required diversion or delay in other projects. (Uhl Tr. 6/10/97 at 157–58.) Dr. Meszaros, who oversaw the placement efforts, described in detail the difficulty in finding or developing community placements, the need to individualize those

placements, and the substantial expense. (Meszaros Tr. 6/10/97 at 22–28, 37, 84–88, 90.) Many but not all of the TBI/NRDD population eventually were successfully placed in the community. (*Id.,* Defs.' Trial Ex. G106 D and E.)

■ Against this background, throughout the trial, the parties disagreed on the proper method for measuring the cost of community-based treatment as compared to the cost of institutionalization. The plaintiffs focused primarily on the per capita cost of a community placement; the defendants pointed to the continuing fixed cost of maintaining the State's mental hospitals in addition to the cost of individual community placements. In *Olmstead,* the Supreme Court came down squarely on the side of the defendants in this debate. Rejecting the "simple comparison" between community placement and institutional confinement, Justice Ginsburg recognized that a

> State ... may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions.

527 U.S. at 604, 119 S.Ct. at 2189 (internal citation omitted). This must be taken into account even if it is only an "interim" cost. *Id.* 119 S.Ct. at 2188 n. 15. *Olmstead* also recognized that some individuals "may need institutional care from time to time to stabilize acute psychiatric symptoms." *Id.* at 605, 119 S.Ct. at 2189. In this case, it is undisputed that the State will need to maintain some threshold number of hospital beds indefinitely for acute and, in a small percentage of cases, long-term care. MHA Director Oscar Morgan estimated

---

**43.** Recognition that a lawsuit may be filed does not constitute an acknowledgment that the suit should succeed.

**44.** The two million was not renewed, but contracts for placements initiated with that money continued to be funded. (Meszaros Tr. 6/10/97 at 57; Uhl Tr. 6/10/97 at 159.)

that number at 1,100 or 1,200. (Morgan Tr. 9/15/97 at 142.) Indeed, the representative plaintiffs and other TBI/NRDD patients not infrequently require periods of re-institutionalization even after community placement. (*See, e.g.,* Meszaros Tr. 6/10/97 at 81–82; Cassidy Tr. 12/11/96 at 109, 132, 153.) Most importantly, the ADA is not reasonably read to compel a State to put patients at risk by closing its institutions or to drive a State to move institutionalized patients into "inappropriate" settings. *Id.* The pace of "downsizing" a State's institutions reflects both fiscal and medical policy choices that are difficult to make. The evidence at trial fully supported the defendants' position on the comparative cost of community treatment and the limited or delayed amount of savings to be recognized by de-institutionalization.

Plaintiffs' expert Dr. David Salkever, a specialist in health care economics, testified that, on an average per diem per capita cost comparison, institutional care is more expensive than community care. (Salkever Tr. 9/17/96 at 33; Pls.' Trial Ex. 6Bii, 212.) In Dr. Salkever's opinion, the range of cost for community placements for individuals with TBI or NRDD as of mid–1995 was from $80,000 to $110,000 while the range for institutional placements "really started at $110,000 at the very lowest, and tended more toward $170, 180 even $200,000." (Salkever Tr. 9/17/96 at 26; *see also* Pls.' Trial Ex. 62, 212.) His comparison relied on FY 1996 figures; as the defendants point out, by that time the State already had significantly downsized its institutions, therefore increasing the average daily rate for institutional care. The State does not dispute, however, that in general the average annual cost of a community placement will be less than the average daily rate at an institution. (Defs.' Summ. of Evid. at 114.)

Despite this differential, no immediate cost saving to the State results from a community placement. For at least some period of time, the State will be required to maintain the fixed cost of the institutional bed. (*See, e.g.,* Benjamin Tr. 7/25/97 at 17–18.) As recognized by plaintiffs' expert Ms. Cooper, institutional closing "is not a short-term planning process. It's two to five years, with the hope of long-term savings. . . . Double funding of systems—there are costs associated with maintaining an institution even while you are downsizing it. That is a known and legitimate recognized factor." (Cooper Tr. 9/11/96 at 69.) Asked to assume the truth of budget figures set forth in Pls.' Trial Ex. 160, Ms. Cooper stated:

> It appears from those figures that Maryland has made significant gains in shifting resources from institutions to communities in a short period of time. Rather commendable. And I would suggest that if that is the trend, and that appears to be the direction they wish their system to go, these individuals would fit perfectly into that continued shift of resources. These are very costly people in very costly settings. Therefore, it would seem to fit with the trend that those figures, if they are factual, represent.

(Cooper Tr. 9/11/96 at 93; Pls.' Trial Ex. 160.) Dr. Salkever agreed that "for quite a few years there has been a pronounced downward trend [in patient census at Maryland State psychiatric hospitals] really as part of a long-term process of de-institutionalization," and that "community placements [in Maryland] really began to increase substantially from say the early 80's, and are continuing to increase in numbers." (Salkever Tr. 9/17/96 at 18; Pls.' Trial Ex. 159). In discussing the difference between fixed and variable costs of institutional care, Dr. Salkever explained that "the first critical concern is

the time frame." (Salkever Tr. 9/17/96 at 37.) In connection with placement of patients in the community, he described one to three years as "short to medium term; and then beyond that would be long-term." (*Id.* at 38.) In the short term, as the patient census falls, the per capita rate rises. (*Id.* at 57; Johnson Tr. 9/15/97 at 38.) The most significant cost savings of downsizing would occur in a three to five year time frame. (Salkever Tr. 9/17/96 at 57–58; Johnson Tr. 9/15/97 at 46–48.)

Further, the cost savings to be realized by the state by placing TBI/NRDD patients in the community represents a relatively small percentage. There were approximately 60 TBI patients in State institutions at the time of trial. (Salkever Tr. 9/17/96 at 49, 53.) Reaching the large volume of change necessary for replacing a substantial portion of the fixed costs depends on the state's overall progress

> ... while the TBI patients themselves are relatively small in number, the fact is that what is going to be going on is a fairly substantial continued decline in the institutional population, and that implies that a large volume change will occur and a relatively substantial portion of those average costs can be regarded as variable *in the long-term.*

(Salkever Tr. 9/17/97 at 38–39 (emphasis added); *see also* Johnson Tr. 9/15/97 at 36–39.)

■ Measured against the three to five year time frame, and considering the need to maintain a minimum number of hospital beds and also to fund placements for other persons in need of community treatment, the State's progress in placing members of the TBI/NRDD population into the community has been acceptable. The immediate shift of resources sought by plaintiffs would have resulted in a fundamental al-teration of the State's provision of services within the meaning of *Olmstead.*

## CONCLUSION

The representative plaintiffs in this case all have suffered serious and debilitating injuries, whether from trauma or childhood developmental difficulties. When the State takes on their care, as it should, it must fulfill that obligation in compliance with the Constitution and the ADA. The evidence spread before the court reflected contrasting perspectives on a very difficult set of circumstances. The plaintiffs' pain and frustration was genuine and understandable; the defendants' efforts to provide a stable, safe, and caring environment also were genuine and commendable, if not always successful. In the end, the plaintiffs have not shown sufficient reason for the court to order the State of Maryland to do more.

A separate Order of Judgment follows.

## *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. The defendants' Motion in Limine to exclude the testimony and reports of Dr. Nancy Ray is **Granted;**

2. Judgment is entered in favor of the defendants on all claims; and

3. This case is **Closed.**